**DAGLEY v. DAGLEY.**

Nos. 28924, 28949.

St. Louis Court of Appeals.

Missouri.

July 20, 1954.

Rehearing Denied Sept. 10, 1954.

Frank Mashak, St. Louis, for appellant.

Josephus M. Todd and Louis E. Zuckerman, St. Louis, for respondent.

**HOUSER, Commissioner.**

These are consolidated appeals from two judgments of the Circuit Court of the City of St. Louis in proceedings ancillary to a divorce action. The appeal in case No. 28,924 is from a judgment modifying a custody award by taking from Dorman L. Dagley, the father, and awarding to Lucy Ellen Briley, the mother, the custody of their infant child Cecelia. The appeal in case No. 28,949 is from a judgment allowing Lucy Ellen Briley $225 suit money and $325 attorneys' fees as expenses in connection with the appeal of case No. 28,924.

On July 19, 1946 Dorman L. Dagley was granted a divorce from his wife Lucy Ellen and was awarded the complete custody of their then 2-year old daughter Cecelia, in an uncontested proceeding based upon the husband's charges that the wife had been intimate with and was pregnant by another man, and neglect of the child. Dorman L. Dagley was then and is now in the service of the United States Navy, and was and is a resident of the State of California. The decree made no reference to any visitation privileges of the mother. Although the decree did not expressly permit, it did not prohibit, Dorman L. Dagley from taking the child out of the jurisdiction.

On August 28, 1952 Lucy Ellen Dagley, now Lucy Ellen Briley, filed a motion to modify the custody order so as to give her the custody of the child, alleging that the decree of July 19, 1946 was improvidently entered, contrary to the rules of the court and without provision for visitation privi-

leges on her part; that the decree awarding custody was made without her knowledge and contrary to a distinct understanding that she would not consent to the giving up of the custody of the child; that Floyd and Edna Newton, of Ellington and Bismarck, Missouri, the maternal grandparents, have had the actual custody of the child from July, 1946 until August 5, 1952, during which entire period the father made no effort to see the child except on two occasions, once when he stopped at the home of the grandparents in order to get a rifle which belonged to him, and again in August, 1951, when with the mother's permission he took the child to California for a two weeks' visit; that during the period 1946–1952 the father neglected the child and provided nothing for her support until the summer of 1952, when the grandparents received three $25 allotment checks from the Navy; that previously the father made his allotment in favor of his mother instead of his child; that the father has remarried and has a child by the new marriage; that during the visit in the father's home in 1951 his present wife Bessie placed Cecelia and Bessie's own child in a bath tub for punishment, and that she left them there unattended; that on that occasion the father became intoxicated and spent one night in a drunken condition on the lawn; that the father and Bessie offered Cecelia whiskey to drink; that on August 5, 1952 the father took the child from Missouri and removed her to California without authority from the court, thereby depriving the mother of the right to see the child within this state, causing Cecelia to have an emotional upset; that the mother is now remarried, living with her husband in St. Louis, ready, able and willing to give the child the loving attention to which she has been accustomed, and that the welfare of the child will be best served by permitting her to remain at the home of the maternal grandparents in Bismarck, Missouri.

Plaintiff's answer denied that the original decree was improvidently entered and that defendant was not aware of the fact that plaintiff was to have custody of the child, and alleged that when plaintiff returned from overseas service he found his wife pregnant by another man and eager for a divorce; that defendant was then living in St. Louis and the child was with the grandparents at Ellington; that from 1946 to 1952 plaintiff was in the United States Navy and had no opportunity to visit with the child except on the two occasions mentioned; that he did not neglect the child but that the child was left with the Newtons by mutual agreement between him and them that they take care of the child while he was in the service; that the child was provided with clothing and other things by plaintiff's mother at plaintiff's request; that most of the allotment money received by plaintiff's mother was used for an endowment policy for the child. He denied the allegations of neglect, misconduct and mistreatment, admitted that the Newtons had furnished a Christian home for the child and found no fault with their care of the child, admitted that the child had been taken to California, not surreptitiously as alleged, but after advice by counsel and alleged that the child now has the loving attention of her father and stepmother, in whose home she is being educated, receiving all of the care, love and comforts of life, and being raised in the church.

By her reply the mother, in addition to denials of the affirmative matter contained in the answer, alleged that she was coerced into signing the entry of appearance and that by misrepresentation she was denied the services of counsel in the divorce case in 1946.

Following a hearing of the motion to modify, the circuit court modified the custody provisions of the decree of July 19, 1946 by transferring custody from the father to the mother, reserving visitation privileges to him together with the privilege of taking the child, at his own expense, to California for two months in the summer time, under proper restrictive conditions. The judgment further awarded defendant $500 for attorneys' fees. Plaintiff's appeal from that judgment is numbered 28,924.

Plaintiff raises thirteen "assignments of error." The first point is that the trial court erred in sustaining the motion to modify for the reason that the order is against the weight of the evidence and is not supported by the credible evidence. It, therefore, becomes our duty to review the whole record, giving prime consideration to the best interests and welfare of the child, to determine whether defendant has shown by a preponderance of the credible evidence that there has been a change of facts and circumstances since the entry of the 1946 decree, sufficient to require a change in the custody provisions then made. We should defer to, and not lightly disturb, the judgment of the trial court, but if that judgment is in conflict with the clear preponderance of the evidence and discloses a manifest abuse of judicial discretion, it is our duty to direct the entry of the proper judgment under the law and the evidence. Davis v. Davis, Mo.App., 254 S.W.2d 270.

Defendant's evidence on the motion to modify consisted of her own testimony, and that of her parents, her present husband, a neighbor, and one of her attorneys. Plaintiff was not present and did not submit any evidence on the merits by way of deposition or by oral testimony, except that of Felix Chopin, head juvenile probation officer attached to the domestic relations court.

Divorced on July 19, 1946 defendant, then 21 years old, proposed to and married Lowell Polk on July 26, 1946. A child was born to her on January 27, 1947. Plaintiff had returned from overseas service on May 12, 1946. Defendant claims that plaintiff is the father of the child although she at no time told plaintiff it was his child, and Lowell Polk's name appears on the birth certificate as the father of the child. Another child was born to defendant during the Polk marriage which terminated by divorce in April, 1951. On April 11, 1951, defendant married Harold Briley, her husband at the time of the trial. The Brileys have one child of their own.

Shortly after the 1946 divorce plaintiff married his present wife. They have two children by that marriage. Plaintiff, now 34 years old, has been in the Navy, continuously from the time he was 16 years of age.

From the time she was 7 months of age until she was 7 years old Cecelia lived with her maternal grandparents at Ellington and Bismarck, Missouri, in an 8-room house, where she had her own room and enjoyed proper care, attention and upbringing in a Christian home. During that period plaintiff, who was stationed in California, wrote to the grandparents inquiring about the child a total of eight times in 1946, once in 1951 and once in 1952. He sent no money, with the exception of the three allotment checks of $25 each in 1952. He sent but little clothing for her and did not remember her on Christmas and birthdays. He visited with her a few minutes in 1947 at which time he visited the home of the grandparents and took away a gun which belonged to him. By consent of the parties concerned plaintiff took Cecelia to California for a two weeks' visit in his home in the summer of 1951. From 1946 to 1952 defendant lived in St. Louis. Except when there was sickness in her family defendant would come to the home of her parents on week ends, at which time she would see Cecelia. Defendant's father, Floyd Newton, a contractor, 62 years of age, and her mother, Edna, aged 50 years, have been and are financially able to support the child and are willing to continue to do so. They would welcome the child's return to their home. Defendant's husband at the time of the trial, Harold Briley, a machinist by trade, makes between $100 and $115 a week and is financially able to care for Cecelia. He would be glad to have the child in his home. The Brileys, husband, wife and two boys, live in three rooms in the City of St. Louis.

In August, 1952 plaintiff took Cecelia from Missouri to California under the circumstances detailed in Middleton v. Tozer, Mo.App., 259 S.W.2d 80, and which need not be repeated here. Upon his ar-

rival in California plaintiff wrote Floyd Newton as follows:

"Dear Mr. Newton:

"I am sure you will want to hear from Cecelia. The little girl is enjoying herself and is in perfect health. She is having the time of her life. Now, as to her future, I am going to keep my daughter with me for the time being. I believe that is the proper place for her. I regret the abruptness of my manner in the matter of ending the girl's visit with you. I assure you it was the best for her. There was no fight or emotional upheaval or anything that upset her in any way. I have purchased for Cecelia a complete new outfit, some shoes and clothing, and have registered her for school. I felt that my daughter was about to be taken entirely away from me. I felt that I was being cheated out of providing for her and raising her. I will not give her up, of course, in any such manner. Such a thing is ridiculous. I am aware of the attachment of you to my daughter and I will write to you about her regularly and will send you pictures and bring her to see you. Feel free to write to us at all times and bear us no ill will. Do not ask me to let my daughter come to stay with you. It cannot be.
"Sincerely,
"Dorman L. Dagley.

"P.S. Anything you might wish to send Cecelia may be sent to this address or to Mrs. M. E. Middleton at 4466 Forest Park. There is nothing that she needs except perhaps some personal toy or possession."

Since that time defendant has heard nothing from plaintiff or anyone else concerning the child's whereabouts or welfare. Defendant's efforts to contact Cecelia have been futile. Defendant testified that in a letter from plaintiff "he said we could have no contact with the child; we were not to see the child." By her motion defendant has alleged that the interests and welfare of the child will be best served by transferring the custody of the child from plaintiff to defendant, in order that the child may resume its life in the home of the maternal grandparents in Missouri. In support of the motion she asserts that the original decree was improvident and improperly entered; that during the first six years of the operation of the decree plaintiff neglected, abandoned and failed to support the child; that in 1951 the child received improper care and treatment while visiting in plaintiff's home; that by removing the child from Missouri defendant has been deprived of her right to see the child within this state; that the removal of the child from the home in which she has been raised has caused an emotional upset in the child; and that she has a home and wants to give proper attention to the child whose welfare will be promoted by her continuing to live in the home of the maternal grandparents.

Evidence in support of the contention that the original decree was improvident and improperly entered had no place in the trial of this motion to modify, for the reason that it was a collateral attack upon the decree. If the judgment of July 19, 1946 was obtained by fraud the proper remedy would have been an independent suit in equity to set aside the judgment, and not a motion to modify the judgment. In this connection see Allcorn v. Allcorn, Mo.App., 241 S.W.2d 806.

Defendant did not establish that during the first six years of the operation of the decree plaintiff neglected, abandoned and failed to support the child. The child did not suffer from neglect nor was it abandoned during the period in question. All of the evidence indicates that the child was in a good home, receiving the best of care and that she was there by agreement between the Newtons and plaintiff, and with the acquiescence and consent of defendant. Defendant does not contend that the child was neglected in the home of the Newtons, indeed that is the home in which she now seeks to have the child re-established. Her complaint is that plaintiff neglected to support the child, visit the child and keep in close contact with her. While these facts apparently are true, and indeed are regrettable from the standpoint of optimum relations between father and daughter,

they do not affect plaintiff's rights under the decree. In appraising plaintiff's apparent indifference we must bear in mind the great distance at which plaintiff lived, which would account for the rarity of his visits. In the matter of failure to send support money it appears that Mr. Newton was not only financially able but also perfectly willing to support the child. There is no evidence that he called on plaintiff for any support during that period or that plaintiff refused to comply with any request for support of the child made by either the Newtons or defendant. That plaintiff did not voluntarily send support money to the Newtons, under the circumstances, is not ground for taking the custody from him.

■ With reference to defendant's contention that in 1951 the child received improper care and treatment while visiting in plaintiff's home, the court permitted defendant and the grandmother, over plaintiff's objection on the ground that it was hearsay, to testify to conversations with Cecelia following her return from the two weeks' visit in plaintiff's home in California during the summer of 1951, in which Cecelia related the facts surrounding the bath tub, whiskey and intoxication incidents referred to in the motion to modify. The reception of this evidence as proof of the facts therein alleged was a clear violation of the hearsay rule, and in making our own findings we disregard this evidence.

■ Concerning the point that by removing the child from Missouri defendant has been deprived of her right to see the child within this state, the decree gave defendant no right to see the child and plaintiff's removal of the child from this jurisdiction did not violate any right of defendant stemming from the decree. Middleton v. Tozer, supra. The removal of the child from the jurisdiction, however, did affect defendant's natural parental right of access to the child, Middleton v. Tozer, supra, and provision should be made for reasonable visitation privileges on the part of defendant.

In support of defendant's contention that the removal of the child from the home in which she has been raised has caused an emotional upset in the child, the grandmother testified that Cecelia loved her grandfather very much and always wanted to come home after being away for a day or two on a visit; that after Cecelia returned from California "she would wake up screaming that he was taking her away and she would beg me to sleep with her so that nothing could take her away. She said her daddy—she dreamed her daddy was taking her away, and I would go into the room and sleep with her." The evidence does not indicate whether this occurred frequently or on one occasion only. In answer to a question as to the effect on the child's health and welfare "as a result of being taken out there to California in the way she was," the grandfather testified: "I'm afraid it was injured. She's an awful moody child that-a-way; she's temperamental." There is absolutely no evidence in the record as to the living conditions and circumstances in the child's new environment in California or as to the emotional condition of the child in her new surroundings. There is no evidence whatever that she is not being properly cared for in her present home, and no substantial evidence that her welfare has been adversely affected by the removal. Defendant failed to sustain the burden of proof in this connection.

■ As to defendant's assertion that she has a home and wants to give proper attention to the child whose welfare will be promoted by her continuing to live in the home of the maternal grandparents, it is to be noted that while defendant classifies her own home as a suitable place in which to raise the child she is not asking the court to place the child in her home but requests that the child be replaced in the home of her parents, which is some 70 miles distant from defendant's home in St. Louis. As a practical matter this is a contest between the natural father and the maternal grandparents. In such a contest it is the duty of the court to award the

custody of an infant to the father unless it is made manifest to the court that the father for some reason is unfit or incompetent to take charge of her, or unless the welfare of the child herself, for some special or extraordinary reason, demands a different disposition by the court. State ex rel. Crockett v. Ellison, 271 Mo. 416, 196 S.W. 1140. No such circumstances appear in the case at bar.

■ In summary, the evidence fails to disclose any change of conditions which, in the interest of the child and for its best welfare, require the modification of the original custodial arrangement in the manner prescribed by the trial court.

In the matter of the allowance of attorneys' fees for services in the trial court on the motion to modify, plaintiff makes the point that the trial court erred in the admission of incompetent and irrelevant testimony by defendant's counsel "in regard to work he did on habeas corpus proceeding and his work in connection with certiorari to Supreme Court," that the allowance of $500 is unsupported by the evidence, and is the result of bias and prejudice on the part of the judge. It is obvious that in fixing the amount of attorneys' fees to be allowed defendant in connection with the motion to modify no consideration should be given to the services rendered by counsel in the habeas corpus, certiorari and contempt proceedings. There is nothing in the record, however, to show that the trial judge had any such considerations in mind. The point that there was no evidence in case No. 28,924 to show the financial worth or income of plaintiff at the time of the hearing of June 26, 1953 is technically correct, but in case No. 28,949 there was evidence of plaintiff's income and status. The two cases having been consolidated for purposes of appeal we can and should consider this evidence in ruling on the appeal in case No. 28,924.

Case No. 28,949 was commenced on September 30, 1953 when Lucy Ellen Briley filed her motion for suit money and attorneys' fees pendente lite on appeal. Movant's evidence on this motion showed that she had no money or property of her own with which to pay the expenses of appeal; that in 1946 Dagley, with the rank of Chief Petty Officer, made "over $250 a month;" that he has received raises since then; that he is now Damage Control Chief, United States Navy, on active duty, but that she does not know exactly what his present earnings are; that Dagley has a wife and two children to provide for, in addition to Cecelia. There was testimony that the cost of printing the briefs would be $225–250 and that reasonable attorneys' fees for services on appeal would be from $300–500. The trial court sustained the motion and allowed $225 for briefs and $350 for attorneys' fees. From that judgment plaintiff has appealed.

It thus appears that for attorneys' services on the motion to modify, in the trial and appellate courts, defendant has been awarded a total of $850, plus $225 for printing briefs.

■ One of the points in connection with the appeal in case No. 28,949 is that the court erred in making the allowance therein, "as the same is not supported by any competent evidence," in support of which plaintiff asserts his financial inability to pay such allowances. The hearing of the motion to modify required the services of counsel on two separate days. The matter required considerable preparation and was bitterly contested. There was a motion to set aside the order and grant a new trial, which required their consideration. We could not say that a fee of $500 would be an excessive allowance, given evidence of plaintiff's financial ability to pay that sum. The record, however, fails to disclose such ability. Plaintiff has a family to support. Nothing more than an income of $250 a month is shown by substantial evidence. An allowance of twice plaintiff's monthly income for legal services in the trial court is excessive. Similarly, the award of $350 for attorneys' fees on appeal is excessive on account of the absence of proven financial ability to pay. The award of $225 for briefs was based upon an estimate that the brief would be

50 to 60 printed pages in length. The brief actually was 28 pages long. Printers' charges are $3.50 per page and $7 for the cover page. The award for printing, therefore, should be reduced from $225 to $105.

 Plaintiff further urges that the trial court erred in denying plaintiff's application for a change of venue, filed in connection with the motion for suit money and attorneys' fees pendente lite on appeal. A change of venue may be awarded in a "civil suit," Section 508.090 RSMo1949, V.A.M.S., but such a motion is not a civil suit. It is but a continuation of the original motion to modify, and is merely ancillary thereto. It is not an independent, original action in which a change of judge may be awarded, as the term is construed in Hayes v. Hayes, Mo.Sup., 252 S.W.2d 323. The trial court did not err in this respect.

Entertaining these views it is unnecessary to pass upon numerous other points raised by plaintiff on these appeals.

In case No. 28,924, therefore, it is the recommendation of the Commissioner that the judgment of July 31, 1953 be reversed and the cause remanded to the trial court with directions to set aside the judgment and enter a new judgment modifying the custody provisions of the decree of July 19, 1946 by inserting a provision permitting defendant at her own cost and expense to visit the child in the state of plaintiff's residence during the months of July and August of each year. The judgment should include an allowance to defendant for attorneys' fees in the sum of $150.

In case No. 28,949 it is the recommendation of the Commissioner that the judgment of October 9, 1953 be reversed and the cause remanded to the trial court with directions to set aside the judgment and enter a new judgment awarding defendant $150 attorneys' fees and $105 for printing briefs.

### PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgments of the circuit court are, accordingly, reversed and the causes remanded with directions to proceed in accordance with the views expressed in the opinion of the court.

RUDDY, Acting Presiding Judge, BENNICK, J., and LAWRENCE HOLMAN, Special Judge, concur.