Arah Magalene LIGHT, Plaintiff-
Respondent,

v.

Walter Austin LIGHT, Defendant-Appellant.

No. 7515.

Springfield Court of Appeals.

Missouri.

Nov. 21, 1956.

Ronald J. Fuller, Rolla, for defendant-appellant.

Routh & Hecke, Rolla, for plaintiff-respondent.

RUARK, Judge.

Walter Austin Light, defendant below, has appealed from a judgment which denied his crossbill and gave plaintiff, Arah Magalene Light, a divorce, care and custody of the children and $40 per month support. The assignments of error go to the sufficiency and weight of the evidence.

The parties were married in 1940 and separated in July 1955. Walter was (at trial time) 37 years old and Arah was 31. They had a son age 13 and a daughter 6. Prior to separation they owned (subject to mortgage) and lived in a modest home in Rolla. Walter has one lung only and is limited to light work. His vocation at the time of marriage and still at time of trial was that of taxi driver. His earnings approximated $150 to $160 per month. During a goodly part of the marriage period Arah had worked outside the home, and during the past eight years she had been employed, apparently irregularly and on relief shifts, at Harvey's Restaurant. The hours of this irregular employment were usually from 4:00 p. m. to 8:30 p. m. The husband and wife pooled their earnings for the support of the family. After the separation of the parties Arah commenced working at what is called Dean's Air Castle as a waitress and "in the bowling alley side." This work was also irregular but apparently every Saturday night and sometimes one or two other nights a week. Closing hour at Dean's was 1:30 a. m. There is also some evidence that Arah worked some for the Daily News, but for what length of time is not shown.

To substantiate her charge of general indignities, Arah testified that Walter frequently, "every two or three days" and sometimes every day, falsely accused her of associations with other men, criticized and exhibited no trust in her, "contradicted everything I did," had a high temper, "gets mad," used vile language and cursed at her in front of the children and others, on one occasion tore her clothes off in front of the children, and that "you can't talk to him when he's mad." This is in substance the plaintiff's case, and it came solely from Arah's unsupported testimony.

Walter, on the other hand, testified that the marriage had run with normal smoothness until lately, and especially the last two years, when "she got to where she'd just rather be where I wasn't." The difficulties appear to have arisen out of Arah's associations with other men and with her keeping of late hours and unexplained whereabouts. Evidence concerning these can be treated more clearly by dividing them into separate subjects.

*Frank Capek:* One Frank Capek, said to be a student at the Rolla School of Mines and age 21, frequently came to the Light residence in the absence of Walter, who usually left to go to work about 6:00 in the morning. Walter testified that upon various occasions he returned to his home unexpectedly and found Capek there. When he came into the house on these occasions his wife and Capek would be in the kitchen drinking coffee. Sometimes Arah would be wearing a housecoat or bathrobe, sometimes would be dressed in short "sleepers." Usually the children would be in bed with the bedroom door shut. Walter said that on these occasions Capek's car would be parked up the street a little way from the home. He said that Capek never came in his house when he was there.

Elsie Moreland, a neighbor, testified she had seen Capek in the Light home a half-dozen times when Light was not there. On these occasions Arah and Capek would be sitting at the table drinking coffee when she came into the house and Arah would have on her night clothes, sometimes a short silk gown and sometimes sleepers. She also said that more than a dozen times she had seen a car stop up the street around a hundred yards from the Light home, and that Arah would get out and walk home from there. This was usually in the daytime, but sometimes in the dark. This witness also spoke of an occasion when Arah and Mrs. Moreland's brother sat in the Moreland kitchen and consumed a bottle of whisky and a carton of Seven-Up.

Lillian Steen, next-door neighbor, testified she had seen Capek going in and out of the Light house on various occasions when Walter was not at home. That Capek would park his car up the street and around the corner, and that on one occasion he parked around the corner, cut through Mrs. Steen's yard, jumped a little branch that separated the two lots, and went into the Light home through the back basement door.

Arah's explanation of this source of trouble was that she had worked with Capek, both at Harvey's Restaurant and at Dean's Air Castle, for approximately three years. That his visits to her home always had something to do with his or her employment. That on one occasion when it was raining she had called him to come by and "pick her up" to take her to her place of employment. That he had come by to see whether or not he should inform Ed (presumably the boss) whether she was going to work, another time to ascertain whether she would "split a shift" with him as cook, and on another occasion had stopped to tell her to "turn his hours in." Under examination she stated that Capek had been in her home, in her husband's absence, probably "ten or twenty times." Arah said that while her husband did not "accuse" her of Capek she knew he did not want Capek in his home. Walter testified that Arah claimed to him that she had asked Capek not to come, but he came anyway and there was "nothing she could do about it."

*The St. Louis trips:* Defendant testified that Arah would make frequent trips to St. Louis during the past two years. Virginia Light, Walter's mother (who also lived in Rolla and who it appears was sometimes charged with the care of the children), said Arah made four or five such trips a year. Walter said that on these trips Arah invariably left on Wednesday morning and returned on Friday night. He testified that on these journeys Arah adamantly refused to allow him or the children to accompany her. Arah testified these trips were for the purpose of visiting her grandparents in St. Louis and also to see her sick father (evidence is that he was in the City of St. Louis confined to a hospital for a period of only eleven weeks). She said the reason Walter did not accompany her was that he did not like her relatives. Walter related an instance when Arah was preparing to set off for St. Louis, the daughter, Karen, was ill and cried and begged her mother not to leave, yet Arah departed anyway. Defendant produced Jeanene Gaddy, 18 years old and a friend of Walter's younger sister, who testified that she was in the home on the occasion when Arah was preparing to depart for St. Louis, that at that time Karen was sick and begging her mother not to leave, yet Arah left. The neighbor, Elsie Moreland, testified that on that night she was called and helped minister to the sick child, whose mother had that day gone to St. Louis and was still absent. Mary Alcorn, aunt of Arah, testified that Arah's two grandparents had lived with her in her (Mrs. Alcorn's) home in St. Louis for a long period of time (more than two years), and that during that period Arah had stayed one night (only) in her residence and had been there to eat lunch on three occasions.

*The Ritz Theater:* Walter testified that Arah frequently left him and the children at home alone in the evenings and (ostensibly) went to the movies. That on these occasions she did not want him or the children to accompany her. The witness Jeanene Gaddy was employed at the Ritz Theater as cashier and sometimes took tickets and ushered. She testified that Arah frequently came to the theater, stayed a few minutes, told the employees there that if Walter called they were to tell him that she was in the show and would then depart without waiting to see the movie. Arah explained this procedure as follows: That she would come in from work and Walter would start fussing at her. That in order to escape his carping she would put on her coat and go to the movies alone. She admitted that she sometimes left the theater but said the purpose was to go someplace and get a cup of coffee, and she maintained that she always returned to the movie. In this she was squarely in conflict with the witness Gaddy, who testified that on these occasions Arah would *not* return to the theater the same evening. There was also evidence of an occasion when Arah started to the movies with her son but sent him to another theater. Her explanation of this was that the son and a friend of his wanted to see the comedies at another theater and that she did not care for comedies.

The separation of the parties followed shortly after what might be called the automobile incident, which occurred on the night of July 13. Arah again went to the theater in the family car and again left Walter and the children at the home. Sometime later in the evening Walter got a telephone call, which he said was anonymous, informing him that his wife was with another man. He testified that he then called the Ritz Theater and was informed his wife was not there. He then went down to the Ritz Theater and sent a girl inside to look for her but could not find his wife. He saw the family car parked downtown and went back to the theater and asked those present to look for his wife again. Then he went home where his children were, then back to the car and waited for Arah. After awhile another car drove up alongside. The car was driven by a man and Arah was in it. What followed can best be related in his own words:

"Well, when they saw me, they run the car up about a half a block and

stopped again. And I got over in the front seat and they started out up the street and went to 10th Street, and I started after them. And they went down 10th Street to Pine, and down Pine to 8th, and turned left on 8th and to Cedar, and then turned left. And by the time I got there, Arah was out walking."

He said he stopped and she got in the car. He asked her where she had been and she said "over at Ruby's." That he was watching the car she had just vacated. It turned down a dead-end street and he drove in behind in order to block its path so he could talk to the driver. That he got out of his car, walked over to the stranger in the other car and asked him where he had been, and the driver told him, "I just brought her up from Ruby's." He asked the driver where he was from and he said, "I go to the School of Mines up here." By this time Arah had gotten under the wheel of the family car, backed it up, turned it around and left. That he, Walter, turned around "to holler at her" and heard the stranger's car motor race. That as he turned back around the stranger's car "was coming right for me. So I had to—I pushed myself away from the front end of the car to keep the front end from hitting me, and he slid the car sideways and the back end hit me and he went on." He said he then went home. The doors were locked, and he jerked the hook off the screen door and went in. That he was skinned up, his arm was cut and his clothing was torn. He asked Arah who the man in the car was and she said she didn't know his last name but his first name was Vernon. That he then called a police officer, who came to the house. That in the ensuing conversation she told the officer that the man's name was Vernon, that she didn't know his last name and this was the first time she had seen him. The officer, John Martin, testified that he got the call after midnight; that when he got there Walter's clothes were torn and there were cuts and scratches on his arms and hands. That he inquired of Arah as to the identity of the man she had been with and that she first told him it was "none of my damn business." But later in the conversation she said she didn't know who the man was, that it was the first time she had seen him, that all she knew was that his first name was Vernon and she thought he was a salesman. The witness Jeanene Gaddy, ticket taker at the Ritz Theater, testified that Arah had not attended the theater that night and that she remembered it distinctly because Walter was there twice looking for her and that her attention was called to the incident the following day because she heard he had been hit by a car. Arah's version of the affair was that she left her husband and children at home and went to the movie. She denied she was in a car with another man. She said she came out of the movie, saw her husband was sitting in the car, turned around and started walking home, because "I was going to let him sit there all night." That her husband overtook her at Eighth and Cedar and she got in the car. After she got in her husband said that she got out of "that car there." "I said, 'You're crazy,' and he said, 'I'll prove it to you.'" That he pulled up beside the car, reached down and got a soda bottle and got out of the car. That when he did this she "scooted over in the driver's seat" and went home. She stated that when her husband came home "it looked like to me that whoever was in the car that had just pushed him out of the way, and drove on, because his arm was skinned like where he would hit the gravel, or something."

The night of this incident was the night on which Arah claims Walter tore her clothes off.

There was evidence of other instances bearing upon Arah's behavior. Walter testified that she would go out at night and stay anywhere from 11:00 to 2:00 in the morning and would come in "half ginned up." Officer Martin testified that he worked the "graveyard shift" (from 10:00 p. m. to 7:00 a. m.) and that he had seen Arah going down the streets in automobiles during those hours. He had also seen her in

a place called The Skillet, generally between 2:00 and 3:30 in the morning, usually in a group of four persons, and that Frank Capek was sometimes one of these four. Arah denied that she ever had dates with other men. She explained her presence at The Skillet at late hours by stating that Dean's Air Castle, where she then worked, closed for the night at 1:30 and that after that "the whole bunch" would go to The Skillet and eat.

Walter testified that he did not desire the separation, that what he wanted Arah to do was to change her course of conduct and behave; but at her insistence he agreed to leave the home so that Arah would not take the children out of it. After that he lived at the home of his mother, wherein also resided his unmarried sister. The evidence is clear that after the separation he kept and maintained a close interest in the children. When they were at their home he called to see them every evening after work. From Arah herself we secure the information that he frequently called her to see what was needed by the household in the form of groceries, et cetera. In addition to this, the children spent approximately half the time at the home of Walter's mother. This usually included overnights on Friday, Saturday and Sunday.

The source of the troubles continued after the separation. Walter testified that two nights before the trial his daughter was ill with chicken pox and he wanted to see how she was. About 10:30 he drove by the home and saw a car parked in front, but there were no lights on in the house except a night light in the bathroom. He called the police (he said for protection against false accusations when he went into the house). By the time the police arrived the lights had been turned on in the kitchen and front room. He went to the house and found the screens were hooked. As he was trying to open the door Arah turned on the back light and let him in. Present was one Don Greenwalt (age 22 and by coincidence also a student) sitting on the couch drinking beer. His wife had a gin highball. She

was dressed in blue jeans and a "shorty" pajama top which "didn't cover up as much as a halter." The children were in the bedroom with the door closed and the little girl was asleep. He told Greenwalt to leave, and Greenwalt departed.

Arah's version of this affair was that about 9:30 p. m. she called the drug store and asked if there was anyone who could bring her some cigarettes. Inferentially, Greenwalt agreed to perform this friendly service and arrived shortly afterwards. Walter came about 10:30, "said some filthy things," cursed, picked up a Seven-Up bottle and said, "Are you drinking?" (she said she was not). That she had known Greenwalt ever since he was a little boy.

We have perhaps set forth the evidence at unnecessary length. It will be noted that in each instance Arah's denials and explanations are unsupported. In each instance the husband's complaints are verified by witnesses. These witnesses include Arah's own aunt, two neighbors, one of them next door, a police officer and a theater employee. We could well discard in entirety the testimony of Walter Light and considerable of the testimony of his supporting witnesses and, analyzing the testimony of Arah alone, conclude that she is guilty of improper conduct and associations with other men, and that her husband was not without justification in "fussing" and criticizing her about other men. For instance, we are not disposed to believe that the business pertaining to the work at Harvey's Restaurant (as Arah said occasioned all of Capek's visits) was of such weighty nature it could not have been transmitted over the phone but must be delivered by Frank Capek, like that of a State Department courier, in person; nor that the transaction of such business required his entertainment while clad in her bedroom garments. Nor can we believe that Capek was impelled to hide his car around the corner, cross a neighbor's yard, jump a branch and enter the back door of Walter Light's home simply because of inordinate fondness for Arah's coffee. But why con

tinue? We are convinced that Arah is, at this stage of her life at least, more interested in having her "fling" than she is in maintaining a normal home for her children. We think she helped to express this idea when, at the close of her testimony, this woman who is battling for her children (and child support) was asked:

"Q. Would you still permit Mr. Greenwalt and Mr. Capek to regularly visit in your home if you were granted custody of these children? A. They are friends of mine and I don't intend to quit speaking to anyone."

■ The trial court found in favor of the respondent. With this decision we are unable to agree. In cases of this character it is our responsibility to try the case de novo, to review the whole evidence, come to our own conclusion and render such judgment as should have been entered. Kinder v. Kinder, Mo.App., 267 S.W.2d 356, 358; Richardson v. Richardson, Mo.App., 270 S.W.2d 68, 71; Eikermann v. Eikermann, Mo.App., 283 S.W.2d 391, 394. Respondent urges upon us the rule of deference. It is true that when two or more witnesses have testified at variance and our decision must depend upon which witness is to be believed we lean heavily upon the judgment of the court below. Dunlap v. Dunlap, Mo.App., 255 S.W.2d 441, 442; Robbins v. Robbins, Mo.App., 257 S.W.2d 92, 95; Holmes v. Holmes, Mo.App., 251 S.W.2d 390. For an appellate court looks at a cold printed record, whereas the trial judge has the advantage of observing the demeanor and mannerisms of the witness, not only those which are obvious and apparent, but also the hundreds of delicate symptoms which perhaps are so subtle as not to be clearly recognized separately and alone, but which,

collectively, cast an aura about the witness and produce a composite effect of either the fragrant, clean scent of wholesome truth or the retching stench of corrupting perjury.

But this rule of deference as to credibility is to be applied when we are in doubt. In this case the record leaves us with no doubt. And although the rule (of deference) is a wholesome and oftentimes necessary aid, it has no application in this case. Our responsibility is to decide the case from the record as we find that justice requires, and this responsibility we cannot shirk. Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319; Luckett v. Luckett, Mo.App., 263 S.W. 2d 41, 44; Shilkett v. Shilkett, Mo.App., 285 S.W.2d 67, 72.

■ We find the appellant, Walter Austin Light, to be the innocent and injured party. We believe that he has demonstrated his care and concern for the children who are involved. The record shows that there is room in the house of his mother for this little family and that there will be an adult person, either Walter, his mother or sister, available during all or most of the time to see after them.

The judgment of the lower court is reversed. Plaintiff's petition is dismissed. Defendant is granted decree of divorce on his crossbill. Care and custody of the children, Walter Austin Light, Jr., and Karen Lee Light, is awarded to the father, Walter Austin Light. The plaintiff is allowed right of visitation with such children at such times and upon such occasions as shall be reasonable.

McDOWELL, P. J., and STONE, J., concur.