326 S.W.2d 751 (1959)
L----, Plaintiff-Appellant,
v.
N----, Defendant-Respondent.
No. 7751.
Springfield Court of Appeals, Missouri.
July 11, 1959.
Motion for Rehearing Overruled August 24, 1959.
*752 Riddle & Baker, Malden, for plaintiff-appellant.
Powell & Jones, Dexter, for defendantrespondent.
STONE, Presiding Judge.
As we enter upon the unwelcome and unpleasant duty of writing the closing chapter in another sordid story of marital discord and dissolution, we draw a charitable cloak of anonymity about the actors that two innocent little girls, whose custody is in issue, may not be scourged in years to come by a recorded recital of the sin and shame of their mother. On this appeal by the wife and mother from a decree dismissing her petition and awarding to the husband and father a divorce on his cross-bill and the custody of the two girls, the older born on November 20, 1950, and the younger born on September 23, 1954, the wife's complaints are that the trial court erred in dismissing her petition, in awarding custody of the two girls to the husband, and in taxing costs against her.
The parties took their marriage vows, "till death do us part," on March 12, 1948. The husband was then twenty-one years of age, the wife younger although her exact age is not disclosed to us. About one year and nine months later, i. e., on December 19, 1949, they separated. The primary, if not sole, cause of that separation (as well as subsequent trouble after the parties resumed habitation under the same roof on June 19, 1950) was an "affair" between the wife and her second cousin. It is apparent from letter exhibits that the wife and her cousin had been "going with each other" before the wife married. At some time not fixed in evidence, the cousin entered military service and, by the Fall of 1949, was airmailing to the wife sultry, romantic letters from his post of duty in Japan. Both of the samples in evidence (admittedly received by the wife) saluted her as "Dearest Darling," both began "Received your letter today," both pledged his intense, inexpressible and inextinguishable love for the wife, and both expressed a burning desire for her and a sustaining hope that they might be married. That his illicit blandishments and licentious endearments did not fall on deaf or unreceptive ears is indicated by his letter of September 17, 1949, in which he promised to "write to you (the wife) every day I can" because "you asked me to write to you every day." And, in the same letter, the cousin adjured her to "just be ready by Xmas," promised that "we will make up for all the time that we should have been together & wasn't," and told the wife that "when I do get to come home I want you to be free, & if you love me as much as you say you do you will do that for me."
*753 Shortly after separation of the husband and the wife, to-wit, on December 31, 1949, the wife instituted a suit for divorce in the county of the husband's residence, and service of process was had therein. Apparently not satisfied with developments in that suit, the wife employed different counsel in an adjoining county where she then resided; and, on February 24, 1950, another suit for divorce was instituted in that county. Still being a minor, this second suit was brought on the wife's behalf by the cousin's mother, as next friend; and, in her verified petition in that suit, the wife averred that the husband "has absented himself from his usual place of abode, that he is either a non-resident of the State of Missouri or has concealed himself so that personal service of process cannot be made, that (his) present address * * is unknown." Upon trial of the instant case, her lame "explanation" for this falsification under oath was that "I didn't know that day where he was at." Subsequently, both of the 1949-1950 divorce suits were dismissed.
When the husband and the wife were reconciled on June 19, 1950, she was carrying the child subsequently born on November 20, 1950. The husband originally pleaded in this case, and at the first hearing testified, that this child could not have been his, because (as he said) he had not seen the wife from December 19, 1949, when they separated, until about two weeks before they "went back together" on June 19, 1950. The wife steadfastly maintained that the husband was the father of this child, her explanation being that "we were seeing each other all during the time we were separated" and that they had intercourse "just about every time" she saw him. The transcript does not reveal when the amorous cousin returned on furlough or how long he stayed. But, whatever the truth may be with respect to paternity of the older girl, the husband (by leave of court) amended his pleadings by deleting all denials of paternity and by admitting that both girls were born of the marriage; and, at a second hearing in this case, the father vigorously contended for the custody of both children.
The activities of the cousin during a period of several years after reconciliation of the husband and the wife in June 1950 are concealed by a blind spot in the evidence, but the "affair" between the cousin and the wife again comes into focus some six to eight months before the final separation on February 14, 1958, when the husband "caught them" in an alley. On that occasion, the husband found his automobile parked in the alley, waited until the cousin and the wife (one with an arm around the other and with the younger girl, then less than three years of age, asleep in the seat next to the right door) drove up in another automobile, and then "went over and grabbed him (the cousin) by the shirt collar and * told him I'd had enough trouble with him and I wanted him to get out and leave me alone." That this had no salutary effect upon the participants in the "affair" is indicated by a letter dated September 9, 1957, from the wife to her sister in St. Louis. In that letter, the wife wrote that "you might see (the cousin) up therehe is going up there to try and get a jobI sure hope he gets one"; and, after informing her sister that the cousin's wife (whom he apparently had married after 1950) had obtained a divorce and that the cousin "has to pay her $15 a week," the wife commented that the cousin "needs to get a good job to pay that" and confided that "if (the cousin) gets a good job he wants me to come up there so I will if he does get a good job where I can get by."
The final separation came on the evening of February 14, 1958, when the husband found the wife and the cousin sitting together on a couch in the home of one of the wife's relatives. "I (the husband) asked them outside and they wouldn't come, so I just told her to come and get her clothes." The next day, she did so. The following month, she instituted this suit seeking a divorce, custody of both children, alimony, child support and attorneys' fees. Upon *754 trial, the general indignities charged in her petition found no more than weak and unpersuasive support in her testimony, which (to put it charitably) lack the "naturally compelling ring of sincerity" [Clemens v. Clemens, Mo., 235 S.W.2d 342, 346; Price v. Price, Mo.App., 281 S.W.2d 307, 311], and otherwise were wholly unproved.
Our courts long ago recognized the impossibility of formulating any all-encompassing rule as to what will justify a decree of divorce for alleged indignities and established the necessity of determining each case on its own particular facts and circumstances;[1] but, as a guide to be followed in cases of this character, it has been said repeatedly that indignities warranting the granting of a divorce ordinarily must amount to a continuous course of conduct by one spouse constituting a species of mental cruelty, connoting settled hatred and a plain manifestation of alienation and estrangement, and rendering the condition of the other spouse intolerable through acts of such character and frequency as to be subversive of the family relationship.[2] To us, it is clear that the wife conspicuously failed to prove such indignities by the husband; but, wholly aside from that, the burden unquestionably rested on her to show by a preponderance of the evidence that she was not only the injured but also the innocent party.[3] And, although the requirement of innocence does not contemplate proof of such exemplary deportment or angelic perfection as to exclude all misconduct,[4] we would be more simple and credulous (if not downright obtuse and stupid) than counsel and their clients have any right to suspect that even country appellate judges are, were we to embrace and accept the wife in the instant case as an "innocent" party. Under no concept of that term and in no view of the evidence was she "innocent." Emphatically, we agree with the trial judge that her petition for divorce warranted nothing other than summary dismissal.
However, even though the wife be denied a divorce, she says that she should have custody of both children, and her counsel ply us with some of the commonplace truisms reiterated in most custody cases. Of course, the success of one parent in obtaining a divorce is not the controlling factor in determining whether that parent should be given custody of minor children; [5] such custody never should be awarded with any purpose or thought of rewarding or punishing either parent;[6] and, all other things *755 being equal, custody of children of tender years naturally should be awarded to their mother.[7] But, there is no paucity of cases demonstrating that, where the best interests of minor children will be served thereby, custody will be awarded to the father,[8] for the only rigid, inflexible and unyielding principle in custody cases is that the welfare of the children is paramount and supreme.[9] To that principle, all others must yield and give way; and, in its application, there must be no compromise or reservation.
Our courts have said frequently that the morals of the respective parents are an appropriate and proper subject of consideration in a custody case.[10] As thus employed, the term "morals" obviously should not be and is not limited to sexual conduct. "Moral law" is "(t)he law of conscience" [Black's Law Dictionary, 4th Ed., p. 1160]"the eternal and indestructible sense of justice and of right written by God on the living tablets of the human heart and revealed in his Holy Word" [Moore v. Strickling, 46 W.Va. 515, 33 S.E. 274, 277, 50 L.R.A. 279]; and, "`(s)ound morals as taught by the wise men of antiquity, as confirmed by the precepts of the gospel * * * are unchangeable,'" the same yesterday, today and forever. Commonwealth of Pennsylvania v. Randall, 183 Pa.Super. 603, 133 A.2d 276, 279 280. "Morality is a generic term containing the sum total of all * * * moral traits, including honesty, fidelity, peacefulness, etc.," sometimes "referred to as synonymous with character" [State v. Moorman, 133 Mont. 148, 321 P.2d 236, 240]; and, we think that the very nature of the overriding principle in cases of this character, i. e., that the welfare of the children is paramount and supreme, dictates and demands that an inquiry into parental "morals" encompass not only sexual conduct but also "common decency, cleanliness of mind and body, honesty, truthfulness, and proper respect for established ideals and institutions, among other things." State v. Clein, Fla., 93 So.2d 876, 881.
From time immemorial, truthfulness has been recognized as a cornerstone of morality. One of the Ten Commandments given to Moses on Mount Sinai was the pointed prohibition, "Thou shalt not bear false witness against thy neighbour." Exodus 20:16. In his inspired wisdom, King Solomon declared that "lying lips are abomination to the Lord" [Proverbs 12:22] and twice warned that "a false witness shall not be unpunished, and he that speaketh lies shall not escape." Proverbs 19:5, 9. The word of the Lord through the prophet Zechariah was that "These are the things that ye shall do; *756 Speak ye every man the truth to his neighbour * * *" [Zechariah 8:16]; and, from the apostle Paul came the same ringing command, "Wherefore putting away lying, speak every man truth with his neighbour * * *." Ephesians 4:25. For centuries, perjury has been regarded as an offense involving moral turpitude [United States v. Carrollo, D.C.Mo., 30 F. Supp. 3, 6]; and, from the founding fathers of our commonwealth whose consciences mayhap had not become so blunted and inured to half-truths and untruths, there has come down to us tangible statutory evidence[11] of their reverential respect for the divine precepts adjuring truthfulness and condemning falsehood precepts still accorded diffident lip service but too frequently honored in this day by brazen breach rather than by faithful observance. With truthfulness thus enshrined in the laws of God and of man, how harmonious and how fitting are the declarations of our courts, concerned as they are with the welfare of their wards,[12] that perjury itself demonstrates unfitness to have the care and custody of minor children.[13]
We need not go outside the wife's own testimony in the instant case to ascertain her insolent disdain for the truth. We again note, but pass without further discussion, her testimony concerning the false averments in her verified petition in the second divorce suit brought on her behalf by the cousin's mother, as next friend. Then, we observe that, when asked (while on the stand the first time) why she had written the cousin, she promptly answered, "because he was my cousin was the main reason," but that (when recalled) she bluntly denied that she had ever written the cousin while he was in service, then sandwiched in an equivocal statement that she never wrote "any love letters to him" before returning to a weakened denial that she had written"not that I remember." As the trial judge took over the questioning, the wife finally said, "I've wrote to him (the cousin), but I didn't think I wrote to him while he was overseas, I guess I did." When interrogated about the letter of September 9, 1957, to her sister in St. Louis, in which the wife had written (while still married to and living with the husband) that "if (the cousin) gets a good job he wants me to come up there so I will if he does get a good job where I can get by," she definitely denied that she and the cousin had been or were in love, blandly "explaining" that the cousin had told her "that he would find a job and help me get by if I couldn't get by up there." However, with the candor we have come to expect of them, the wife's counsel frankly informed us in the course of oral argument that the wife and the cousin had married while this appeal was pending. See particularly Watkins v. Watkins, Mo.App., 230 S.W.2d 778, 783-784.
We recognize that prior misconduct does not necessarily require that a mother be denied custody of her children [Johns v. McNabb, Mo., 247 S.W.2d 640, 643; I--- v. B---., Mo.App., 305 S.W. 2d 713, 718]; but, the transcript before us not only indicates the mother's gross, habitual and contemptuous disrespect for the moral law but also reflects no evidence of her repentance and rehabilitation.[14] And, *757 without undertaking the needless task of determining whether the wife was guilty of statutory perjury and statutory adultery, the foregoing will suffice to explain what we believe to be the inescapable conclusion that she is a woman of easy virtue and careless truth who has long since forgotten that the price of a virtuous woman "is far above rubies" [Proverbs 31:10] and that, "as a jewel of gold in a swine's snout, so is a fair woman which is without discretion." Proverbs 11:22.
It being our duty, upon this review do novo, to determine the right and justice of the matters in controversy [Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 75 (8); Dagley v. Dagley, Mo.App., 270 S. W.2d 553, 556(2)], we have considered the evidence most carefully and have put into the scales many factors bearing upon proper determination of the case. Thus weighing and appraising all of the circumstances, we cannot say that the welfare of the two children, whose custody is the primary bone of contention, would be best served by some disposition other than that decreed by the court nisi. On the contrary, we think that the evidence strongly supports that decree. In such situation, we should and do defer to and adopt the findings of the trial judge, which, although not binding upon us, nevertheless are not lightly to be disturbed. Ragan v. Ragan, Mo.App., 315 S.W.2d 142, 147(3), and cases there collected; E___v. G___, Mo.App., 317 S.W.2d 462, 467-468. In resolving this issue of custody, we are deeply conscious that no judicial decree could be entered which would not engender sorrow in some interested party [Abel v. Ingram, 223 Mo.App. 1087, 24 S.W.2d 1048, 1049] and that no earthly power could recapture for these two innocent girls the blessings of which they have been deprived by the tragic failure of their parents' marriage. Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458, 460. But, slight comfort though it may be to us "that we are in no way responsible for the causes which have unhappily brought about the situation with which we are confronted," it may not be amiss to repeat, " (1) et those whose hearts are wrung remember this when, in their pain and tears, they realize the effect of this decree." In re Krauthoff, 191 Mo.App. 149, 152, 177 S.W. 1112, 1113.
We are not unmindful of the fact, emphasized by the wife's counsel, that the husband originally denied the paternity of the older girl. However, he has supported that girl as he has the younger one, paternity now stands admitted, and the husband earnestly seeks the custody of both children. In view of the wife's conduct and character, another tragedy should not be visited upon these children by separating them, but they should be permitted to live as sisters in the same household that they may share their childish joys and sorrows and may have the benefit of those natural ties of interest and affection which sisters have a right to nurture and enjoy.[15] The trial judge must have concluded, and we find no reason to doubt, that the husband will shower upon both girls in equal measure the same parental love, affection and "feeling of security in being wanted" [I--- v. B---, supra, 305 S.W.2d loc. cit. 718]; but, should he at any time fail so to do, we are satisfied that the conscientious trial judge would not hesitate to take appropriate action. Section 452.110, RSMo 1949, V.A.M.S.
Finally, the wife complains that "it is an abuse of discretion to tax the *758 costs against her even though she was denied relief." We agree that, under some circumstances, the court costs in a divorce proceeding properly may be taxed against the husband even though he is the prevailing party.[16] However, where the wife is the unsuccessful party, her status as the wife is not, in and of itself, sufficient to relieve her of liability for costs; and, in such situations, the court's discretionary power to tax costs against the husband, which is derived from the character of a divorce proceeding as one triable by equitable principles, is to be exercised in the light of the facts of each particular case. Crooks v. Crooks, Mo.App., 197 S.W.2d 678, 685. In the instant proceeding, the wife has been allowed (and we think properly so) a fee for the services of her attorneys in the trial court, another fee for their services on appeal, and suit money on appeal. At the time of trial, the husband was earning about $50 per week as an employee of a packing company and the wife admittedly was earning approximately the same amount as an employee of a shoe company. Neither was shown to have had any other source of income or any assets of substantial value. In view of the allowances to the wife, the husband's obligation to support the two girls given into his custody, and the fact that the trial judge did not see fit to exercise his discretionary power to tax the court costs (in an aggregate amount not shown) against the husband, we are not inclined to interfere on appeal with the taxing of costs against the wife, as the unsuccessful party, pursuant to Section 514.060 RSMo 1949, V.A.M.S.
The judgment and decree of the trial court is, in all respects, affirmed.
McDOWELL and RUARK, JJ., concur.
NOTES
[1] Hooper v. Hooper, 19 Mo. 355, 357; Whitwell v. Whitwell, 318 Mo. 476, 481, 300 S.W. 455, 456; Boehme v. Boehme, Mo.App., 72 S.W.2d 115; Garton v. Garton, Mo.App., 246 S.W.2d 832, 838(6).
[2] Clark v. Clark, Mo.App., 306 S.W.2d 641, 646(3); Watson v. Watson, Mo. App., 291 S.W.2d 198, 200; Ames v. Ames, Mo.App., 284 S.W.2d 888, 893(1, 2); Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 435(2, 3); Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554, 561 (2-5).
[3] Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319(6); Chapman v. Chapman, Mo.App., 230 S.W.2d 149, 151(3); Rusche v. Rusche, Mo.App., 200 S.W.2d 577, 580(2); Haushalter v. Haushalter, Mo.App., 197 S.W.2d 703, 705(1); McGinley v. McGinley, Mo.App., 170 S.W. 2d 938, 940(9); England v. England, 225 Mo.App. 725, 734, 39 S.W.2d 429, 434; Esworthy v. Esworthy, 223 Mo.App. 171, 180, 11 S.W.2d 1078, 1082(4); Elder v. Elder, Mo.App., 186 S.W. 530, 532(2).
[4] Simon v. Simon, Mo., 248 S.W.2d 560, 563(2); Dunlap v. Dunlap, Mo.App., 255 S.W.2d 441, 442(1); Holmes v. Holmes, Mo.App., 251 S.W.2d 390, 392(2); Cody v. Cody, Mo.App., 233 S.W.2d 777, 782 (6); Politte v. Politte, Mo.App., 230 S.W. 2d 142, 148(4); Rowland v. Rowland, Mo. App., 227 S.W.2d 478, 484(2, 3); Ridge v. Ridge, Mo.App., 165 S.W.2d 294, 300 (10); Tebbe v. Tebbe, 223 Mo.App. 1106, 21 S.W.2d 915, 918(4).
[5] Paxton v. Paxton, Mo.App., 319 S.W.2d 280, 288(10); McKenzie v. McKenzie, Mo.App., 306 S.W.2d 588, 591(3); Bedal v. Bedal, Mo.App., 2 S.W.2d 180, 184(7); Zerega v. Zerega, Mo.App., 200 S.W. 700.
[6] Green v. Perr, Mo.App., 238 S.W.2d 924, 927(1); Perr v. Perr, Mo.App., 205 S.W.2d 909, 911(3); Martin v. Martin, Mo.App., 160 S.W.2d 457, 459(4); Baer v. Baer, Mo.App., 51 S.W.2d 873, 878(2); In re Krauthoff, 191 Mo.App. 149, 171, 177 S.W. 1112, 1120.
[7] E___ v. G___, Mo.App., 317 S.W.2d 462, 467(1); Ragan v. Ragan, Mo.App., 315 S.W.2d 142, 147; Edwards v. Edwards, Mo.App., 302 S.W.2d 37, 39(2);

S___ v. G___, Mo.App., 298 S.W.2d 67, 78(19); Ballew v. Ballew, Mo.App., 288 S.W.2d 24, 26(4); Long v. Long, Mo. App., 280 S.W.2d 690, 694(5); Cadenhead v. Cadenhead, supra, 265 S.W.2d loc. cit. 436(8); Brake v. Brake, Mo.App., 244 S.W.2d 786, 801(8); Rex v. Rex, Mo.App., 217 S.W.2d 391, 393(2).
[8] M___ v. M___, Mo.App., 313 S.W.2d 209; I___ v. B___, Mo.App., 305 S.W. 2d 713; Light v. Light, Mo.App., 296 S.W.2d 145; Graves v. Wooden, Mo.App., 291 S.W.2d 665; Thomas v. Thomas, Mo. App., 288 S.W.2d 689, certiorari denied 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77; Schneider v. Schneider, Mo.App., 248 S.W.2d 59; Watkins v. Watkins, Mo. App., 230 S.W.2d 778; Manville v. Manville, Mo.App., 81 S.W.2d 382, 389(3). See also the Ragan, S___, Ballew, Cadenhead, Brake, Rowland and Rex cases, supra.
[9] See cases collected in West's Missouri Digest, Vol. 11, Divorce 298(1).
[10] M___ v. M___, supra, 313 S.W.2d loc. cit. 212(1); S___ v. G___, supra, 298 S.W.2d loc. cit. 75; Graves v. Wooden, supra, 291 S.W.2d loc. cit. 667(2); Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 74(4); Dansker v. Dansker, Mo.App., 279 S.W.2d 205, 210(7); Link v. Link, Mo.App., 262 S.W.2d 318, 321(4).
[11] See Sections 557.010 and 557.020, RSMo 1949, V.A.M.S., prescribing far more drastic and severe punishment for the crime of perjury than Section 563.150, RSMo 1949, V.A.M.S., does for "open and notorious adultery."
[12] Sections 452.070 and 452.110, RSMo 1949, V.A.M.S.; McCoy v. Briegel, Mo. App., 305 S.W.2d 29, 35(7); Garvey v. Garvey, Mo.App., 233 S.W.2d 48, 50(1); Morgens v. Morgens, Mo.App., 164 S.W. 2d 626, 632(2); Salkey v. Salkey, Mo. App., 80 S.W.2d 735, 739(2).
[13] Shepard v. Shepard, Mo.App., 194 S.W. 2d 319, 328; S___ v. G___, supra, 298 S.W.2d loc. cit .77(14); E___ v. G___, supra, 317 S.W.2d loc. cit. 467.
[14] Graves v. Wooden, supra, 291 S.W.2d loc. cit. 669; Ackermann v. Ackermann, Mo.App., 280 S.W.2d 425, 427; Dansker v. Dansker, supra, 279 S.W.2d loc. cit. 209. Contrast Ex parte Ferone, Mo. App., 267 S.W.2d 695, 700.
[15] Fisher v. Fisher, Mo.App., 207 S.W. 261, 262; Tuter v. Tuter, Mo.App., 120 S.W.2d 203, 205-206(4); Poor v. Poor, 237 Mo.App. 744, 167 S.W.2d 471, 477-478. Consult also Nations v. Nations, Mo.App., 229 S.W. 269, 270, and Parks v. Cook, Mo.App., 180 S.W.2d 64, 68.
[16] Crooks v. Crooks, Mo.App., 197 S.W.2d 678, 685; Grove v. Grove, 79 Mo.App. 142, 149; 27 C.J.S. Divorce § 197, p. 874. See also Waters v. Waters, 49 Mo. 385, 388.