PLEASANT A. WHITWELL v. FIDELLA M. WHITWELL, Appellant.—300 S. W. 455.

Division One, December 7, 1927.

*C. H. Montgomery* for appellant.

*Norman A. Cox* and *Hugh Dabbs* for respondent.

ATWOOD, J.—This case comes to the writer by reassignment. In March, 1923, respondent, who was plaintiff below, filed suit for divorce against his wife, appellant herein, alleging abandonment and indignities. The wife filed answer and cross-bill, praying to be divorced from respondent on the ground of indignities, and asking for alimony in the sum of $37,500. On May 30, 1923, the court entered judgment and decree for plaintiff and against defendant, the record of which, among other things, recites that "the court finds the issues in favor of the plaintiff and dismisses defendant's cross-bill herein; that the plaintiff is the innocent and injured party; that he sustains a good moral character and is entitled to be divorced from defendant. It is therefore considered, adjudged and decreed by the court that the bonds of matrimony heretofore contracted, entered into and existing by and between the plaintiff and the defendant be and they are hereby set aside, annulled, and for naught held and esteemed; that the plaintiff be and he is divorced from the defendant and restored to all the rights and privileges of a single and unmarried person." Prior to the rendition of this judgment, the defendant, on motion, was allowed fifty dollars a month temporary alimony while

suit was pending in the circuit court.

Appellant's affidavit for appeal was made and filed May 30, 1923. On June 2, 1923, appellant filed her motion for temporary alimony and suit money pending the appeal, which was sustained to the extent that she was allowed the sum of fifty dollars a month for her support to be paid on the first day of each month thereafter until the final disposition of the cause. Thereafter on the same day the trial court examined appellant's affidavit for appeal, deemed it sufficient, and appeal was granted to the Springfield Court of Appeals. Some time later on motion of appellant the cause was transferred on the ground that the amount involved conferred jurisdiction on the Supreme Court. Defendant claimed alimony, as above stated, in the sum of $37,500, and at the trial plaintiff admitted that he was worth about $75,000, his property consisting of farm lands, city business and residence properties, Government bonds, cash and other personal property, so our jurisdiction to hear this appeal is apparent on the face of the record. [Cherry v. Cherry, 150 Mo. App. 414; Vordick v. Vordick, 281 Mo. 279.]

Counsel for appellant abandons her cross-bill and demand for permanent alimony in a brief filed in this court and stands on her answer, which, aside from certain formal admissions and an allegation that plaintiff abandoned her, is in the nature of a general denial. The only questions thus presented by this appeal are, was plaintiff entitled to a divorce upon the petition and evidence, and, was appellant's motion for an allowance for suit money, cost of obtaining transcript of the evidence, printing abstract and brief, attorney's fees, and her living expenses pending this appeal, properly ruled?

Respondent has filed a motion to dismiss the appeal, first, on the ground that appellant's abstract of the record is so incomplete that it fails to comply with the requirement of our Rule 13, and second, on the ground that appellant has not made a fair and concise statement of the facts as required by Section 1511, Revised Statutes 1919, and our Rule 15. Measured by the issues originally framed appellant has undoubtedly offended in both particulars, but in view of her subsequent abandonment of her cross-bill and contention for permanent alimony we are not inclined to dismiss the appeal and the motion to dismiss is overruled.

As to the right of the wife to alimony pending an action for divorce, it is no longer regarded as absolute. Such an order is largely within the discretion of the trial judge. [State ex rel. Gercke v. Seddon, 93 Mo. 520.] According to the statute it should be allowed only "where the same would be just." [Sec. 1806, R. S. 1919.] The court may inquire as to the amount of the wife's property, and if it appears that she has sufficient means to conduct or defend the action and support herself during its pendency,

the motion may be denied. [Penningroth v. Penningroth, 71 Mo. App. 438.] In this case appellant's motion states that she owned a four-room residence and lot in Santa Fe, N. M., in which she had from time to time lived with her invalid daughter, and that she had $2000 in good interest-bearing securities. In this case there is record evidence that the value of the wife's separate property was as much as $8000. We cannot say that the trial court's allowance of $50 a month pending this appeal was an abuse of discretion, and appellant's contention that it was is disallowed.

In addition to the separate statutory ground of abandonment, plaintiff's petition in substance charged defendant with the following as indignities "that rendered his condition in life intolerable:" first, that without just cause or excuse she abandoned him and their home and notified him in writing and orally that she would not live with him again; second, that for several years previous she had refused to live with him as his wife and compelled him to stay out of her room; third, that she often told him that she did not love him and did not care for him; fourth, that frequently, within the preceding four or five years, she told him that she wanted to be free and that she desired a legal separation from him; fifth, she humiliated him by having a widower, who had courted her prior to her marriage to plaintiff, visit her at plaintiff's home, and discussed with him the advisability and means of procuring a divorce from plaintiff. As to what constitute indignities as grounds for divorce, we said in the early case of Hooper v. Hooper, 19 Mo. 1. c. 357: "It is impossible to lay down any rules that will apply to all cases, in determining what indignities are grounds of divorce, because they render the condition of the injured party intolerable. . . . The Legislature chose to leave the subject at large, and by the general words employed evidently designed to leave each case to be determined according to its own peculiar circumstances." In Goodman v. Goodman, 80 Mo. App. 274, it was said: "For an indignity to be intolerable in the statutory sense it must amount to a species of mental cruelty." These expressions are approved in subsequent decisions, and with them in mind, as well as the separate statutory ground of abandonment, we have examined and carefully considered the evidence disclosed by the record in this case.

It appears that plaintiff and defendant were married in 1881 at Clinton, Missouri, and immediately took up their abode at Joplin, Missouri, where plaintiff owned a blacksmith shop and there plied his trade. By the industry, thrift, prudence and economy of both husband and wife they arose from humble circumstances to a position of comfort and financial independence in that city. At the time of the trial plaintiff testified that he had property in his own name of the value of $75,000, and defendant claims that he was worth

at least $100,000.  Out of an allowance made to her in the latter years of their married life defendant saved some money which was prudently invested until she had accumulated property in her own name of the value, according to plaintiff, of $8000, although defendant claimed it was of less value.  Four children were born of the marriage, one of whom died in infancy.  A single daughter afflicted with tuberculosis and about forty years of age was living in Santa Fe, New Mexico, at the time of the trial, and the other daughter and a son were both married and living in homes of their own.  Plaintiff was about sixty-six years old at the time of the trial and defendant was then sixty-two years of age.  Both were highly respected in the community where they lived and there is no accusation or suggestion in the entire record of any act of moral turpitude on the part of either.

There is no great dispute as to the substantial facts leading up to the separation of plaintiff and defendant in June, 1921.  Plaintiff testified that in 1916 he sent his sick daughter to New Mexico for her health and during the subsequent four years defendant spent the summers out there with this daughter.  Plaintiff further testified to occurrences after defendant came back in October, 1920.  We quote from appellant's abstract of this part of the record:

"I came home from the shop one evening and she was standing with her back to the mantel.  I seen she was in an angry mood.  She says, Pleas, I didn't want to come back from Santa Fe.  I don't want to live with you any longer and I wouldn't have come if it hadn't been for Bertie, a niece, the daughter of her sister, and didn't want to come back and didn't want to live with me any more, and she also said, you know I have not been a wife for five years.  She hadn't in fact or in spirit.  I had a standing order to keep out of her room back for about six years.  I kept out.  It only resulted in my getting another order.  There was no physical reason for that; there never had been any mistreatment.  I never made a complaint, and I never bothered her.  She didn't say why she didn't want to live with me, she just made that statement.  It was not new to me, I knew it was in her mind, because before that she had said she wanted to be free.  She didn't give a particular reason for it, more than the best I can understand she had developed a dislike for me.  She wanted to be free to do business for herself and be Fidella M. Whitwell.  I didn't make her any particular reply at this time; I went on into the bath room and washed up, I had just come home from the shop.  Along possibly for two months after this we had a good many arguments, and I wouldn't argue.  She wanted to fuss lots of times and I wouldn't fuss with her.  I told her I wouldn't argue with her.  I did sometimes, but usually got up and went away.  One night about nine o'clock I let down the folding bed where I slept and she came into the

room and sat down on the couch in the southeast corner of the room and she says: Pleas, you know I don't love you any more; I don't care for you, I don't respect you, and I don't expect you to be true to me any more; that was her language. I says, I don't feel exactly that way toward you and as to keeping my vow, and being true, I take second place to no man, and I don't care who he is; that no man was truer than I was, is what I meant, or ever had been. She didn't say no more; she went up stairs. . . . The next time we had a conversation, was after Harry Stewart had been visiting us. Q. Who is Harry Stewart? A. A distant cousin of hers. He lived at Clinton, Missouri. They were raised in the same town; he had been a suitor for her hand in marriage, she told me, and he had paid her attention in Clinton the six or eight months before I went up there. Q. He was a friend of the family and you and he were friends? A. He had visited here once before and I was acquainted with him. Q. And friendly with him? A. Yes, sir. Q. You knew he was here at that time; had you seen him? A. He was at the house in November and paid a visit before this conversation I was telling you when she told me she cared nothing whatever for me. He was there two or three days. Q. You saw him? A. Yes, sir, and made no objection to him. Q. What did you learn and did you learn after that or have any talk with her about it? A. He came back in January, I think the latter part of January, after this visit. He came to the house and was there every day for four or five days, sometime during the day. I met him once and I knew there was something between them, some interesting conversation going on, but I didn't know what it was, but it come to my knowledge what it was, and come to my children's knowledge what it was. . . . I told her she had been discussing divorce with him in the house; I told her she had received letters from him that were registered; she had sent him registered letters and she didn't deny it; she didn't deny she had discussed divorce with him. I told her she had been talking with the children about divorce and she didn't deny it, and I told her she had been talking to her brother, C. W. Powers, about it, and she didn't deny it. She said she wanted a divorce. On Saturday a few days after this, she said, Pleas, tomorrow is Sunday, you will be at home. I want to have a serious talk with you and I want to settle our affairs. Sunday morning we went to the sitting room, she was standing up by the couch and I was standing by the grate; she says, Pleas, I want a divorce. Must have been in February, 1921. And she said, 'I want it before the leaves come out.' That was her language. I says, Dell, you have no grounds to get a divorce and you would have to prefer charges against me that are not true and I wouldn't stand it. She says I want a divorce and I can get it if you will help me; others get it. And she says I want a divorce

whether I get a cent in property or not; I want a divorce. My reply was this: Dell, you are going out with DeEtta and stay a good while, several months, and see if you want a divorce, and her reply to me was, Pleas, I don't believe you would sue me for divorce if I deserted you; that was her reply. We didn't talk further at that time. Before our daughter came she went and got her a big wardrobe trunk; she put in her time putting all her clothes in it and getting them fixed, except a brown two-piece winter suit, that is the only wearing apparel she left in the house she ever expected to wear. The trunk was full. She also put in that trunk a set of silver knives and forks, the best we had. She went with my daughter to New Mexico. . . . I told her when she went to New Mexico to stay a while and think that over about that divorce. I didn't hear from her for five months. My letters were addressed: 'My dear folks,' though the envelope was addressed to my daughter. She never wrote me a scratch of a pen. In November, 1921, I got a letter which is here in court. That was after I notified her to go and study this matter over.''

The letter here referred to was dated at Santa Fe, New Mexico, October 5, 1921, addressed to plaintiff in defendant's own handwriting and signed by her. The opening sentence reads: ''It has now been five months since I left your home to make my home in Santa Fe, New Mexico.'' Without burdening this opinion with the entire letter, which is long, suffice it to say that in it defendant declared that it had been a great many years since she either loved or respected plaintiff; that she had left plaintiff never to return, and would never again live in a home to which plaintiff held a title. She also demanded that plaintiff pay her $5,000 as her share of the property, threatened that in event he failed to do this she would sue for complete divorce and division of the property, and wound up with the line: ''This is the last letter I will ever write to you.'' Plaintiff testified that he never had another letter from her, and his suit for divorce was not filed until March 8, 1923, more than sixteen months later.

Plaintiff's married daughter and his son, though naturally reluctant to appear in this contest between their parents, corroborated the father to the extent of saying that their mother had told them that she did not love or care for plaintiff and did not want to live with him any more; that she talked with Mr. Stewart about getting a divorce; that when she went to New Mexico in 1921 she said that she had made arrangements to stay away permanently and was not coming back, and that plaintiff had always been good to defendant. Aftter summons in this case was served on her, defendant wrote to her son stating that she never intended to return to Joplin to live. She subsequently came to Joplin, but said that she only came for the purpose of defeating the divorce proceeding by any means possible.

Defendant's witness Mrs. Fannie Powers also testified that plaintiff was kind and good to his wife, and that after defendant returned to New Mexico in 1921 she wrote her that she would never live with plaintiff. This letter was not introduced in evidence, because destroyed by defendant after she was served with process to produce it in court.

Defendant took the stand as a witness in her own behalf. Most of her testimony was in support of her cross-bill which has since been abandoned. The facts above testified to by plaintiff, her children and Mrs. Powers were not seriously controverted. Her principal effort was to excuse them on the ground of ill health and nervousness following her change of life, and an operation for cancer a few years previous, but the evidence of her own children was that her recovery was good, accompanied by a return to her normal health, and that there was no noticeable difference between her condition in 1921 and that of previous years when she enjoyed good health; that she had always been irritable and nervous, while her husband was mild and quiet.

Dr. S. A. Grantham, who operated on defendant for cancer and thereafter treated her, testifying in her behalf as to the condition which he found when he operated upon and treated her said: "The condition was a highly nervous woman with a cancer and dread of cancer in her heart. I have been rather well acquainted with her for several years. I don't see any sign of craziness in her. I see an excessively nervous woman, remarkably intelligent."

In further defense of her letter addressed to plaintiff under date of October 5, 1921, it is urged that plaintiff premeditatedly withheld one-half of her allowance for a period of several months for the express purpose of inducing a fit of anger that would cause her to write him just such a letter. Plaintiff testified that he did not send her the full allowance of $50 a month for several months, because of some financial losses that he had suffered that year, but that he soon resumed making full payments and continued to send her the full allowance of $50 a month. When we consider that the divorce proceeding was not instituted until more than sixteen months after this letter was received by plaintiff and that defendant never thereafter wrote him, the suggestion that this letter was the outcome of a sudden fit of anger carries little weight. As a matter of fact, the record read as a whole clearly indicates a settled purpose of rather long standing on the part of defendant to force her husband into a divorce and a division of the property, the matter of property being apparently uppermost in her mind.

We have been reluctant to affirm the decree divorcing this couple in the evening of life, especially since it necessarily precludes permanent alimony to the wife whose efforts apparently contributed in

considerable measure to the accumulation of the husband's fortune. However, we are irresistibly driven to the conclusion that the substantial weight of the evidence sustains plaintiff's charge of defendant's abandonment for the space of more than one whole year next before the filing of the petition, and his statutory charge of indignities. In the light of the circumstances disclosed by the record we feel constrained to defer to the finding and judgment of the trial court, and the judgment is affirmed. All concur.