230 S.W.2d 184 (1950)
CHAMBERLAIN
v.
CHAMBERLAIN.
No. 27768.
St. Louis Court of Appeals. Missouri.
May 16, 1950.
*185 Ralph L. Alexander, Columbia, Warren D. Welliver, Columbia, Alexander, Ausmus & Harris, Columbia, and Warren D. Welliver, Columbia, of counsel, for appellant.
Thomas G. Woolsey, Boonville, Woolsey & Woolsey, Boonville, and Versailles, of counsel, for respondent.
WOLFE, Commissioner.
This is a suit for divorce in which the defendant filed a cross-bill. The finding of the trial court was for the plaintiff and custody of a daughter born to the parties was awarded to the plaintiff with a limited right of visitation granted to the defendant. From the decree defendant prosecutes this appeal.
The petition alleged that the defendant had "physically mistreated" the plaintiff, abused and berated her and had written vile and abusive letters to her making her condition as his wife intolerable.
*186 The cross-bill charged that the plaintiff was cold and indifferent and that she had frequently advised the defendant that she no longer cared for him and did not intend to live with him as his wife. It also alleged that the plaintiff had written numerous slanderous letters about the defendant to his superior officers in the United States Army, that she had falsely accused him of immoral conduct, that she had refused to let him see their child and had stated that she never wanted him to see it.
Prior to the marriage of these parties the defendant was a cadet at the United States Military Academy at West Point and the plaintiff was employed there as a secretary. They started going together and became engaged to be married about a year before their wedding which took place at West Point in June of 1945. After their marriage they went on a honeymoon trip which lasted for about a month and consisted of a stay in the City of New York, Canada and a visit with the parents of both the defendant and the plaintiff. At the termination of this trip both parties went to Ft. Benning, Georgia, where the defendant was on duty for about two months. In October of the same year he left for a tour of duty in Germany and his wife went to her parents' home in Moberly, Missouri.
In March of 1946, a daughter was born to the plaintiff and the mother and daughter lived in the home of the plaintiff's parents until May of 1948 when plaintiff secured a position in Columbia, Missouri, where she was living with her daughter at the time of the trial.
Plaintiff testified that the defendant was a sadist and that from the first night of their marriage he slapped and beat her before having sexual intercourse with her. She stated that he cursed her, engaged in vulgarity and forced her to have intercourse whenever they were alone.
She stated that while visiting her parents on their wedding trip he came to the breakfast table with nothing on except his underwear shorts which were buttoned only at the top, indecently exposing himself in the presence of her mother, sister, father and a female servant. She remonstrated with him about this but to no avail. She said that once when she and the defendant drove to a nearby park he put his hand over her mouth and held her by the neck until she could hardly breathe. They returned to her parents' home and she went to her room weeping after telling her father what had happened.
Plaintiff's father testified that he asked the defendant if the plaintiff's statements were true and that the defendant said they were and that she was his wife and he could do as he pleased. Later the plaintiff's father had a talk with the defendant and sought to dissuade him from any future violence toward the plaintiff.
Plaintiff's sister and the maid employed in plaintiff's parents home both testified that they had heard plaintiff crying and the defendant cursing her during the visit of the couple in Moberly.
The defendant denied that he had ever struck the plaintiff or that their sexual relations had been other than normal. His version of the occurrence at Moberly was that plaintiff's mother attempted to persuade his wife to leave him and had told her that he was a brute because plaintiff had become pregnant. He stated that after that when he and his wife were in the park she was arguing with him about her mother and he put his hand over her mouth because she continued to talk without giving him a chance to reply.
During the time the parties lived together plaintiff wrote a number of letters to the defendant's parents in which she spoke of the defendant in affectionate terms and stated that she would be lonesome when he went overseas. These letters were in evidence and disclose nothing other than a cordial relationship between the plaintiff and defendant's parents and contained expressions of esteem and affection for defendant.
Introduced in evidence were many letters written by the plaintiff to her husband after he had left for Germany. Up through December of 1945 the letters contained expressions of passionate love for the defendant, a longing for his return and spoke of fond memories of the time they had spent with each other.
*187 The letters plaintiff started receiving from the defendant around December of 1945, which were introduced in evidence were extremely vulgar. They dealt mostly with sex. No purpose could be served by stating their contents except for one of them which appears pertinent to the issues raised. In it the defendant wrote of his work at Landsburg prison in Germany and stated:
"I have nice padded cells here where I can personally work over my victims! What could give more pleasure? heh! heh! heh! How I love to torture! I have the most ingenious inventions for extracting the most excruciating pains and screams from my murderer victims! They too think it is pleasure so long as it is applied to another prisoner and not to them! We are all mad killers here! heh! heh! heh! If I could only get you in my clutches I could torture you too! That would be fun! Yes wouldn't it? heh! heh! heh!"
In the spring of 1946 plaintiff's letters to defendant became cool. They were void of words of endearment or expressions of love but contained no charges of misconduct nor reference to a divorce. The defendant commenting in a letter on this change stated:
"I trust that you do not have any boy friends. If you do have some social contact with other men I don't mind if you avoid anything that might cause gossip and I will never suspect you of being too friendly to anyone. You don't have to avoid men but I hope you haven't fallen in love with some handsome understanding man who sympathizes with a beautiful good little wife whose husband beats her, neglects her, and argues with her. Please give me another chance before you divorce me for some Moberly swain. Since your last letters omit any mention of love I assume you must have this intention. I now feel sorry for myself and will pause for five minutes crying."
Plaintiff's explanation of her change of attitude was that she had entertained hopes that the defendant would change until she received the vulgar letters which to her indicated that no change had taken place.
In June of 1946, a Mr. Feldman, at the request of the plaintiff, wrote to the defendant in Germany stating that the plaintiff desired a divorce.
Defendant declined to enter his appearance to a divorce and stood upon his rights under the Soldiers' and Sailors' Civil Relief Act, 50 U.S.C.A.Appendix,§ 501 et seq. He telephoned her and threatened to take their daughter away from her. The plaintiff later wrote to the President of the United States, Congressmen, and many Army officers, telling them that the defendant was a sexual sadist and had mistreated her, seeking their aid in getting a divorce. Because of these accusatory letters the defendant had been subjected to numerous army investigations which doubtlessly hurt his career.
The defendant returned to the United States and went to Moberly, Missouri, in June, 1948. He went to his father-in-law's place of business in an effort to see his wife and child. An argument resulted there and later when the defendant attempted to gain admittance to his father-in-law's home he was arrested. He left Moberly the following day and in November he called at his wife's place of employment. She stated that he tried to choke her on this occasion and his version of it was that he only tried to talk to her and was not conscious of touching her unless he did so in an effort to prevent her from calling the police. The police were called and he was again arrested.
There were witnesses who testified that the plaintiff was a person of fine character and that she was a good mother. There was also evidence that if she obtained the custody of the child it would live in the home of its maternal grandparents who were people of means and of good standing in the community.
Four officers of the United States Army who attended West Point with the defendant and had known him for about seven years testified that his reputation for veracity and morality was good. The defendant's mother testified that she had never seen any signs of discord between the parties when they were together, and a *188 friend of the plaintiff testified that they seemed happy when they first visited Moberly.
Dr. Stine, Director of Medical Service in the hospitals of the University of Missouri and head of their neuropsychiatry department, testified on behalf of the plaintiff. He was asked a hypothetical question by which he was required to assume that a young husband conducted himself in the manner plaintiff had stated that the defendant had done and upon that hypothesis to state whether or not it was reasonably probable that such a person would harm his wife. His answer was: "I would say that that is a very clear picture of sadism, and that any partner of his in sexual commerce would have to run the hazard of having pain inflicted upon them." He was further asked:
"Assuming the facts I gave you in the hypothetical question, and assuming further that a daughter was born to this man and his wife on March 4, 1946, assuming the truth of all those facts, Dr. Stine, in your opinion would this daughter and infant approximately two and one half years old, be in danger of physical harm from this man if he were alone with her?
"A. She would be in danger if he thought he could inflict pain on the mother by harming the child, or if the child looked like the mother, he would be likely to harm her."
The trial court made a finding of fact in which it discussed the plaintiff's charge of sexual mistreatment and stated:
"Plaintiff is a very intelligent woman and the Court is constrained to believe that had such cruel punishment been inflicted and had it continued during their married life as the habit and conduct of a sexual sadist, then plaintiff most certainly would not have tolerated such cruel treatment for any length of time, but would have left him. It is possible that defendant was excessive in his sexual relations with plaintiff. Some of his letters indicate that his thinking was too much along that line. Court finds that defendant is not guilty of being a sexual sadist and that he was not guilty of cruel treatment of plaintiff in this particular."
There was a further finding that plaintiff's account of defendant's conduct in Moberly when they were visiting her parents was true and upon this the court found for the plaintiff and further decreed:
"And the Court doth further find that the plaintiff is entitled to have the general care and custody of the minor child, Cathryn Maree Chamberlain, subject to the right which should be given the defendant to visit said child in the home of plaintiff's parents, Mr. and Mrs. C. E. Throckmorton, at Moberly, Missouri, four times each calendar year from 1:00 P.M. to 5:00 P.M., provided, however, that the defendant should be required to notify plaintiff of his intended visit so that such notice shall be received by the plaintiff at least five days before the date of the visit, and such visit should be free, unrestricted and cordial, but such visit should be in the Throckmorton home until this decree is modified by this Court, if modified, upon a hearing for modification based upon due notice, and provided this same right of visitation should be given to the parents of defendant, but such right of visitation by defendant's parents should not be in addition to the four visits allowed defendant each year, and provided defendant's parents should be permitted to make a visit or visits at the same time with defendant, and provided any visits made by any of the three separately shall count on the four visits allowed defendant for each year, and provided that if the defendant or his parents shall fail to make the four visits in any calendar year they should not be permitted to make up for it in any other calendar year, and provided that in the event defendant should desire while in Moberly on a visit to exercise his right of visitation so as to use two or more of his four days on succeeding days he should be permitted to do so, but the hours of visitation and other restrictions hereinabove stated should apply."
It is contended that the court erred in permitting the plaintiff to testify about statements made to her by the defendant in the telephone conversation as it was privileged communication. The incompetence of one spouse to testify to the *189 contents of communications from the other is not absolute. It may be waived by agreement or by a failure to object when such confidential communications are offered. Thompson v. Thompson, Mo.App., 84 S.W.2d 990; State v. Powell, Mo.Sup., 217 S.W. 35; Revercomb v. Revercomb, Mo.App., 222 S.W. 899. The objection to the telephone conversation came after the plaintiff had testified to several statements made by the defendant to her when they were alone and no objection was offered to these statements. It also came after there had been introduced by agreement the many letters that both had written to each other. These were all subject to exclusion because they were communications between husband and wife, but the defendant did not avail himself of the right to exclude them. The question presented is whether or not the phone conversation should have been excluded in view of what had preceded its introduction.
Similar situations have been passed upon by our courts in considering confidential communications between physician and patient. It has been held that where objections have been waived to some confidential communications all of such relevant communications are admissible evidence. Epstein v. Pennsylvania R. Co., 250 Mo. 1, 156 S.W. 699, 48 L.R.A.,N.S., 394, Ann.Cas.1915A, 423; Priebe v. Crandall, Mo.App., 187 S.W. 605; Bouligny v. Metropolitan Life Ins. Co., Mo.App., 160 S.W.2d 474; Demonbrun v. McHaffie, 348 Mo. 1120, 156 S.W.2d 923. In the case of husband and wife and physician and patient it is the relationship which bars communications as evidence. A waiver goes to the relationship and when exercised as to some confidences which could otherwise be excluded it opens the door for proof of other communications. The objection to the evidence of the phone conversation came too late and the court did not err in admitting it.
The second contention is that the court erred in holding that plaintiff was the innocent and injured party. This case is certainly one that calls for a close analysis of the evidence presented. The learned trial judge was mindful of this as evidenced by his finding of facts. The court did not believe that the plaintiff had been subjected to the cruel sexual treatment to which she testified because she continued to live with the defendant and after his departure wrote letters expressing passionate love for him. Believing some of the testimony of the plaintiff the court found for her and the defendant asserts that there is no basis for believing the truth of the few incidents testified to while disbelieving the facts that constitute the main charge in plaintiff's testimony.
As to plaintiff's charge of sadistic treatment her attitude would certainly defy explanation to the point of being unbelievable, as stated by the court, if we considered only the letters that she wrote and the fact that she continued to cohabit with the defendant, but there was more than this. She stated that the defendant told her all men treated their wives in the same fashion and she said she was dazed by the condition in which she found herself. The plaintiff may well have believed at the time she lived with her husband that she was obliged to adjust herself to his desires. The letters of the defendant which stand unexplained by him seem sufficient corroboration of the plaintiff's testimony to make her story of his conduct believable. The conclusion reached by the court in finding that the plaintiff was the innocent and injured party appears correct and therefore it does not matter that it considered only part of the credible evidence in reaching its conclusion.
Plaintiff's action in writing numerous letters about defendant's treatment of her to many public officials and army officers in her effort to obtain a divorce was certainly harmful to the defendant. She was very familiar with army life and it is not unreasonable to assume that she knew that her action was harmful. The defendant states that by reason of this she is not the innocent party. That conclusion does not logically follow, for it appears that her letters were primarily intended to bring the defendant into court rather than to harm him. They were written after the *190 defendant had phoned her and threatened to take their daughter from her. Her action was certainly more hysterical than logical, but it did not deprive her of her status as the innocent and injured party.
It is further contended that the defendant's acts were condoned by the plaintiff but that does not appear to be the case since "condonation is forgiveness and pardon for past offenses committed with full knowledge. Condonation for repeated acts of cruelty and indignities will not be inferred from toleration and association afterwards." Arnold v. Arnold, Mo.Sup., 222 S.W. 996, 999.
The defendant asserts that the decree is unjust and the court abused its discretion in limiting the defendant's right of visitation as it did. We have frequently stated that in determining the respective claims of parents to the custody of their child the welfare of the child is the chief thing to be considered. The testimony left no doubt that the child was well cared for and that the mother was competent to bring it up. It is true that the decree closely limits and regulates the father's right of visitation and is detailed as to time and place, but in considering the restrictions it contains we are obliged to remember that these parties clashed to such an extent that twice the police were called.
In the case of Perr v. Perr, Mo.App., 205 S.W.2d 909, 913, we stated that under such harassing circumstances the decree should contain "specific and positive directions". The trial judge doubtlessly moved by a consideration for the child's welfare and with the advantage of having the parties before him made a very painstaking effort to properly determine this perplexing matter and deference should be accorded to his findings.
The Commissioner therefore recommends that the decree be affirmed.
PER CURIAM.
The foregoing opinion of Wolfe, C., is adopted as the opinion of the court.
The decree of the circuit court is accordingly affirmed.
ANDERSON, P. J., and HUGHES and McCULLEN, J., concur.