Frances M. COLEMAN (Plaintiff),
Respondent,

v.

Joseph G. COLEMAN (Defendant), Appellant.

No. 30070.

St. Louis Court of Appeals.
Missouri.

Dec. 2, 1958.

Harold O. Piening, St. Louis, for appellant.

Mills & Palumbo, Myron D. Mills, St. Louis, for respondent.

WOLFE, Judge.

This is an action for a divorce in which a cross bill was filed by the defendant. Upon trial the court dismissed the cross bill and awarded the plaintiff a decree of divorce. The court also awarded her $3,000 alimony payable at the rate of $300 per year and additional weekly alimony in the sum of $15 per week. It also decreed that the defendant should pay $45 per week for the support of the children. Defendant appealed.

Plaintiff in her petition charged the defendant with adultery. She also charged that he choked her and accused her of immorality before their children. She alleged that he was not considerate of her, that he stayed out late at night, and that he failed and refused to adequately support her and three children born of the marriage.

The defendant in his answer and cross bill denied all of the charges of the plaintiff's petition and alleged that the plaintiff was cold and indifferent toward him. He also alleged that she was nagging and quarrelsome, and that she belittled him in the presence of friends and their children. It was alleged that she called him vile names; that she refused to prepare his meals and frequently told him that she no longer loved him. It was also charged that she stayed out late at night and associated with other men.

Plaintiff testified that she and the defendant were married in 1943 and that there were three children born of the marriage. Their ages were six, twelve and thirteen years. She said that most of the domestic trouble started when they moved from Maryland to St. Louis in 1953. At that time her husband changed his employment and went to St. Louis to work. She followed a month later with the children. He earned in his new job $110 a week and there was a "possibility of a bonus" according to plaintiff.

Plaintiff said that before they came to St. Louis defendant would at times come home and clean a gun and click the trigger. She also said that he had a bad temper and would at times kick the furniture and smash things. At one time he choked her and once he hit her with his fist. She said that her husband was with his brother's wife four or five evenings a week and that he called her on Sundays. She also said that she found lipstick stains on his shirt and that some contraceptives that he kept were unaccountably missing. She further stated that he was associating with a woman who worked in a department store.

Plaintiff, said that defendant called her obscene names and charged her with associating with other men, in the presence of their children. The parties paid $100 a month rent for the place in which they lived. The defendant considered this too high and urged that plaintiff find another house. She said that she had no automobile and could not look for another place and that since the husband had rented the house it was up to him to find another place.

Plaintiff said that defendant gave her $20 a week and that when she asked for more money he would throw some across the table at her.

In March of 1954 plaintiff drew out all of their joint savings which amounted to $400 and took all of the furniture and moved with the children to Oklahoma where her family lived. She returned in January, 1955, and after that for a while defendant gave her $35 a week for food. He refused to pay medical expenses for the children, and he started staying out late again and at times would not get home until 3:30 in the morning.

Plaintiff admitted that she struck her husband one time with her fist and threw a plate at his head. She said that she was provoked to do this by the defendant. She denied that she had associated with other men.

Finances played a large part in their difficulties. Bills were not promptly paid. The telephone was cut off for nonpayment of the bill, water was also cut off for the same reason, and the rent was in arrears at times. Plaintiff was asked to itemize all of her financial needs. She listed everything from rent and food to the cost of a baby sitter. This estimate of her needs totaled about $320 per month. She testified that she was employed as a clerk-typist and that she earned $220 a month. She said that her main interest was to see that the children were provided for and that she needed a minimum of $10 a week in addition to the temporary allowance of support money which was $40 a week.

During part of the time this suit was pending the defendant continued to live in the same house with his wife and children but he occupied his own room. The suit was filed in May of 1956. In September of 1956 a relief agency paid some overdue utility bills for the plaintiff and gave her $15 cash in December of that year for her Christmas needs.

The plaintiff called as a witness the brother of the defendant. He testified that he was divorced and that he had been married to the woman mentioned by the plaintiff. He said that his brother lived at his home for about a month. While the defendant was there he would drive his sister-in-law home from work or go out to dinner. The witness said that he was aware of the fact and that when they went out they would stop by his place of employment. He testified that these associations were "platonic", and that he trusted his brother and had confidence in him. He said that he had visited his brother's home and had never seen any quarreling, but he had been there at times when he was conscious of tension between them. He said that on such occasions his brother would be casual but the plaintiff cold. He also testified that his brother admitted that he had associated with other women. On one occasion he went with his brother to the apartment of a woman who worked at a department store. The purpose of the visit was to get some furniture from her home. He said that he knew his brother had dinner occasionally with this woman.

The defendant testified that he was employed by the Fact Photo Laboratory as a professional photographer. At the time of the hearing he was working for them in St. Louis but there was a possibility that he would be sent to Youngstown, Ohio, where he had been working shortly before the hearing. His work consisted in part of taking photographs for schools in the St. Louis area. He worked as many as six or seven nights a week and traveled as far as a hundred miles to take pictures. He also took photographs of store windows and he said these had to be taken at night to avoid reflections. As part of his work he also ran classes in photography, teaching girls to take pictures. These classes were conducted two nights a week. He said that up to 1953 he was making from $6,000 to $8,000 a year and that the money he earned was brought home and that it was deposited in a joint checking account. He also maintained a joint savings account. These accounts were in the names of himself and his wife. He said that in 1953 his income started to go down. At that time the parties were paying $115 a

month rent. In order to cut down expenses they moved in January of 1954 to a place where the rent was only $70 a month. As stated, the plaintiff left in March of that year and the defendant thereafter was sent to Detroit by his employer. The plaintiff later joined him there and when they moved back to St. Louis they moved into the house that they occupied at the time the suit was instituted. The defendant remained at the house after the suit was filed until October of 1956. He said that he left after a violent argument.

The defendant denied that he had improper associations with other women. He said he had associated with the woman who worked in the department store for business purposes; that he was desirous of establishing a photograph department in the store and sought her aid to accomplish this. When questioned about the gun his wife said that he frequently cleaned, he said that the only gun that he owned was a shotgun and that he used it frequently to hunt crows. He cleaned it as it needed it and at no time threatened his wife with it. He testified that at times when he came home a man would leave the house and that he saw one man there on several occasions. He also said that once a week his wife would leave the house and stay out until 1:30 a. m. The plaintiff had been previously interrogated about this and she said that her going out at night only happened about once a month when she went out with a woman neighbor. They would go shopping and then to a picture show and have something to eat after the show.

The defendant testified that his income had dropped until he was only earning $5,300 in 1953. He said that his salary, owing to a change in his duties, had been reduced to $77 a week at the time of the trial. When he was earning $117 a week he paid his own automobile expenses. He told his employer he could no longer do this. He also testified that his personal living expenses amounted to about $47 a week. He had no property other than an automobile which was worth about $300.

The foregoing constitutes the pertinent evidence upon which the case was submitted. It resulted, as stated, in a decree for the wife with an award of $45 a week for the children, $15 a week alimony plus alimony in gross in the sum of $3,000 payable at the rate of $300 per year.

 It is first contended that the plaintiff was not subjected to indignities sufficient to constitute grounds for a divorce. As stated, the plaintiff testified that the defendant struck her, that he called her vile names, and falsely charged her with infidelity, and that all of this was said in the presence of their children. This coupled with the testimony relating to the charge of adulterous conduct and a failure to properly support, if credible, was considerably more than enough to warrant the court in granting the plaintiff a divorce if she was also adjudged to be the innocent party. The indignities sufficient to sustain a decree of divorce are wrongful acts and conduct over a course of time which are of sufficient gravity to make the plaintiff's life as defendant's spouse intolerable. Whitwell v. Whitwell, 318 Mo. 476, 300 S.W. 455; Stevens v. Stevens, Mo.App., 158 S.W.2d 238; Culp v. Culp, Mo.App., 164 S.W.2d 623.

 The defendant complains that the court erringly admitted in evidence over his objection conversations between the plaintiff and the defendant and that such conversations were privileged and confidential. It is quite true that conversations between husband and wife are privileged communications and are not admissible in divorce actions. Revercomb v. Revercomb, Mo.App., 222 S.W. 899, loc. cit. 905; Rudd v. Rudd, Mo.App., 238 S.W. 537. An exception to this is found where there has been a waiver of a privilege by a failure to object to testimony about such communication. Chamberlain v. Chamberlain, Mo. App., 230 S.W.2d 184; Thompson v.

Thompson, Mo.App., 84 S.W.2d 990. It should also be noted that personal abuse by the use of vile names is not within the privilege as this is in the nature of a "verbal assault", and is not a mere communication. Meyer v. Meyer, 158 Mo.App. 299, 138 S. W. 70. Since neither of these exceptions are present in the evidence here complained of, the court did err in admitting it. In the instant case the admission of the evidence does not appear to have been prejudicially erroneous, for excluding it there was still ample evidence to sustain a decree of divorce. Upon appeal we consider only such evidence as the court below should have considered. We allow due deference to the trial court on the question of the credibility of witnesses, but we reach our own conclusion upon the evidence. Without further restatement of the facts, it seems unquestionably clear that there was sufficient proof that the plaintiff was both the innocent and the injured party.

■ The defendant also contends that the court erred in its award of alimony in that it failed to take into consideration the financial situation of the parties and that the award was grossly excessive. The plaintiff conversely contends that alimony is an assessment of damages for the breach of the marriage contract and should be left to the discretion of the trial court. The first case to which we are cited by the plaintiff is Nelson v. Nelson, 282 Mo. 412, 221 S.W. 1066, 1069, in support of the proposition that she advances that "alimony is an assessment of damages". This, however, is not the holding of the court. What the court said was that in a *limited sense* at least it may be deemed an assessment of damages". (Emphasis ours.) It went on to say, "the elements that enter into and make up the measure of such damages are for all practical purposes, and on principle should be, determined by the same considerations that determined the amount of alimony under the unwritten law, the prior treatment of the spouses respectively of each other, the needs of the wife, the 'faculties' of the husband, etc." Thus the elements that go to a determination of the amount of the award remain substantially unchanged by this case and the other cases cited by the plaintiff.

Under the award made the defendant would have to pay $300 a year for ten years toward the award of $3,000 alimony. This would amount to $25 per month. He would also have to pay $45 per week for the children and $15 additional alimony to his wife. The above sums average $285 per month that the defendant would be required to pay under the decree. The court apparently chose to believe that the defendant was still earning $117 a week which would amount to a total of $6,084 a year, or $507 a month. If this was in fact the amount he earned he would have left from his earnings $212 after payment of the $285 awarded. He testified that he had been obliged to pay the expenses of operating his own car out of the $117 a week that he was drawing. This would, of course, have to be deducted from the $212 left. The amount of such expenses are not in evidence but there seemed to be no doubt that there was considerable travel and the cost of automobile transportation would be substantial. If, on the other hand, the defendant was only earning $77 a week, as he stated, then his income was $4,004 a year or an average of $333.66 a month. If from this amount we deduct the $285 awarded, the defendant would have left only $48.66 a month upon which to live. In view of the foregoing, it seems that the award was quite excessive under either view that we take of the defendant's testimony. Since the plaintiff testified that she could live on an adequate scale if she had a total award of $50 a week, and since this was supported by a list of the expenses she was obliged to pay, we consider that sum to be an adequate total award under all the evidence, for it is important to maintain the defendant and his earning capacity or we destroy the source of the income.

All other points which have been properly raised have been disposed of by what we have heretofore said.

In view of the foregoing, the decree of the court is reversed and the cause remanded with directions to enter a new decree, the same in all respects as the one entered by the trial court except as that decree relates to alimony and support for the children, and in that respect the new decree entered shall provide that the defendant shall pay to the plaintiff $45 per week for the support of the children and $5 per week alimony.

RUDDY, P. J., and ANDERSON, J., concur.