**James F. WATERS, Plaintiff-Appellant,**

v.

**Stella WATERS, Defendant-Respondent.**

No. 30987.

St. Louis Court of Appeals.

Missouri.

May 15, 1962.

Hale W. Brown, Kirkwood, for appellant.

Earl R. Blackwell, Hillsboro, for respondent.

BRADY, Commissioner.

The appellant, hereinafter referred to as the plaintiff, filed suit for divorce alleging general indignities, and the respondent, hereinafter referred to as the defendant, filed her answer and cross-bill, also based on general indignities. The trial court found for the defendant on plaintiff's petition, and awarded her a divorce on her cross-bill and $3,500 as alimony in gross, and costs. Plaintiff has perfected this appeal contending that the trial court erred in denying him a divorce upon his petition, in awarding the defendant a divorce, and in granting $3,500.00 alimony in gross.

The plaintiff's amended petition alleges that the defendant did not take proper care of the home; that she " * * * is habitually addicted to intoxicating liquor and frequently becomes intoxicated * * * ";

that the defendant "* * * habitually frequents taverns at night * * *" when he is working; "* * * habitually takes plaintiff's automobile and goes to places unknown to plaintiff * * *"; that defendant "habitually" drives plaintiff's car when she is intoxicated, and without his permission; that she neglects the home and shows no proper affection or respect for plaintiff; and that she "apparently" married the plaintiff to get a home for herself and her fifteen-year-old son, and not "* * * because of any affection for plaintiff." The plaintiff also alleged as an indignity the specific occurrence of June 15th, when defendant took his car without his permission and collided with a parked car, which resulted in plaintiff's insurance being cancelled, and that defendant deliberately misinformed plaintiff concerning this occurrence.

There is a "Count II" stated in the plaintiff's amended petition. By the allegations thereof plaintiff contended that prior to the marriage plaintiff purchased some furniture for a total of $440.00, and that when the plaintiff and defendant separated the defendant took possession of this furniture and has retained it. It was further alleged in Count II that defendant had a $40.00 interest in this furniture, and that the plaintiff was willing to pay her this $40.00, and prayed the court "* * * to order the defendant to account for the said articles of furniture and to deliver possession * * *" thereof to plaintiff upon the payment of this $40.00. This count the trial court dismissed. The appellant has not briefed any allegation of error with regard to this ruling and the question is not before us. Mathews v. Mathews, Mo.App., 337 S.W.2d 529. See also White v. Kuhnert, Mo.App., 207 S.W.2d 839; City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4.

Defendant's answer was a denial of everything except the marriage. The general indignities alleged in her cross-bill are that plaintiff left her and has refused to live with her; that he absented himself from home repeatedly without "explanation or excuse;" embarrassed her in public on the few occasions they went out together; that his attitude and disposition toward her was hostile; that he "* * * continually engaged in unmerited bickerings and arguments * * *" with her; that "* * * for extended periods of time * * *" plaintiff sulked, pouted and refused to converse with her; and that plaintiff "* * * constantly mistreated and abused defendant's minor son by continually criticizing * * *" and nagging him. By his answer, the plaintiff placed these allegations in issue. Under our ruling in this case we do not reach the question of whether the trial court abused its discretion in awarding $3,500.00 gross alimony, and accordingly, the evidence bearing on that issue will not be summarized herein.

The plaintiff testified that the parties were married on either the 3rd or 4th of May, 1960, and separated on August 3rd of that year; that he "* * * treated her as good as I could treat her. Bought everything she asked for, fixed the house up * * *"; that this work on the house cost approximately $3,000.00; that the defendant would take his car and go into town "* * * maybe once or twice a week. And of course, I knew she was going out but I didn't know where she was going. She come in a drinkin'. And I got to checkin' the speedometer. She put 8, 10 miles, 12 miles and I'd never know where she went * * *"; that he had put down the dates of these trips and the mileage, and referring to this list testified that on Saturday, June 4th "* * * She went to town with me", but he didn't put the mileage down; that on Wednesday, June 15th, she went into Festus with plaintiff and then went on to Herculaneum, an eight-mile round trip, but "* * * She put 20 miles on the car"; that on Saturday, June 18th, she went to Festus with plaintiff and put 9.6 miles on the car; on Friday, June 24th, she came into Festus with plaintiff but the speedometer readings he gave showed less mileage when the defendant came back than

when she left; that on Wednesday, July 13, "* * * she went to town for groceries, she put 85 miles on the speedometer that day * * *" and when he asked the defendant where she had been, she said, "Well, you know when you go to town, you don't know when you're coming back or when you're going." It further appeared from his testimony that it was twenty-one miles from their home to Festus.

The plaintiff's testimony with regard to the defendant's drinking was that defendant drank "* * * all the time. I took a handy 6 home practically every day, sometimes two * * *", and when he left home for work his wife would drive the tractor to a tavern about one and a half miles from their home and "* * * maybe drink one or two while she's up there * * *"; that he found defendant in an intoxicated condition on a half a dozen occasions during the three months they were married; that when defendant was drinking she would want to argue with him but he wouldn't do so and would "* * * just get up and walk off"; and that these arguments were about a door or window that wouldn't shut right, "* * * or this was wrong or something."

With regard to the allegations in his petition dealing with his wife's neglect of the home, plaintiff testified that "* * * she didn't do too good taking care of the home. Naturally, she slept 'till 11, 12 o'clock in the days * * *": that part of the time she cleaned up the house and part of the time she did not; that he came in about 1:30 at night from work, and "* * * part of the time I had a meal when I came in, and part of the time I didn't * * *"; that when he came in, "* * * She was always in bed. She never asked me if I wanted anything * * *" but would argue with him "* * * a couple of times 'cause I'd wake her up, turn the light on, you know, make a little noise or something."

With regard to the occasion which he alleged led to cancellation of his insurance, the plaintiff testified defendant went to Herculaneum to put a wreath on her husband's grave and when she returned he asked her who hit her or what happened, and she told him "* * * she hit a post at the cemetary * * *"; and that nine days later it developed that she had hit a parked car, and the owner thereof came to see him, and "* * * they cancelled my insurance."

With respect to the wreck defendant had with the car, it developed that the damage done was that a headlight was broken and a fender bent and the cost of repairs was $16.00. It also developed that the week before that occurrence plaintiff had had a wreck doing some $50.00 worth of damage, and when questioned further the plaintiff abandoned the other allegations concerning the wreck but repeated that his wife should have told him what happened.

On cross-examination, he testified that he and the defendant met about a year before the marriage; that the first time he proposed, she accepted but later "* * * turned me down and went with another fella * * *"; that when they started going together again he proposed and said he would marry her "* * * if she'd straighten up—when I mean, and wouldn't go out to these taverns. I didn't want her to go out unless I was with her"; that he did not know she went to taverns, but when she came back with the mileage on the car "* * * she'd be drinking * * *"; that "* * * I wasn't stopping her from drinking * * *" but he did not want her "* * * to go out and drink unless I was with her * * *"; that he drinks beer and whiskey "once in a while"; and that "* * * I knew she drank. I drank with her when we was going together. We'd go out and have a few beers, maybe to her sister's or maybe to a place where she was a working, Alta's, out on the CC Highway. I have no objection—what I mean, but I didn't figure it was right to go out and get drunk and driving cars drunk and she'd come

**236**

up * * *." When asked if he ever saw the defendant anywhere drinking, he stated, " * * * I didn't see her. That's what I say, she'd go to the places, I never know—she'd never tell me where she went. When she'd come in, she'd be a drinking." At another point in the testimony, when asked again why he wanted this divorce, plaintiff stated, "Because she drank. She'd go out and drink and put the miles on the car and come in drinking", and that it was "Her drinking and going out" that caused him to want a divorce. Plaintiff admitted he never asked anyone else where she went or if she drank, that "Well, I just—I know she went out. I didn't know where she went. I knew she put the miles on the car and she'd come in drinking."

It further appeared from his testimony that defendant's son was the subject of some contention between these parties, the plaintiff testified that he planted eight acres of corn and that this boy helped one day, and also spent one day helping to get in the hay; that he asked the boy to do different little things and when the defendant's son refused, he'd ask the defendant why, " * * * and she'd say, 'Well, he's just a kid,' or 'He don't know how,' or 'Maybe don't want to be a farmer.'" Plaintiff agreed that the boy had never lived on a farm before.

It also appeared from cross-examination of plaintiff that defendant had " * * * helped a little * * *" with the remodeling of the house.

Plaintiff testified that when he told the defendant he wanted a divorce, she asked him why, and that she had never said she wanted a divorce; that he left her out at the farm because his lawyer told him they couldn't both sleep there and she wouldn't leave; that he took the car but she had the tractor, and her son had an automobile; and that he has never supplied any support since the separation.

Other evidence on plaintiff's behalf was given by Miles Reed, Charles Edward Shannon, Elwin Frazer, and Jake La Mure. The testimony given by La Mure, Frazer, and Reed went only to establish the plaintiff's reputation for, as the question was put, " * * * truth, morality, good citizenship, veracity." Shannon also testified on this point and in addition testified that on three or four occasions during the summer these parties were married, he had seen the defendant at this cafe or tavern near their home, and that she would " * * * get her a handy 6 of beer and take it back with her. * * *" On cross-examination this witness testified that he never saw her " * * * conduct herself in any manner as to be uncoming or befitting a woman."

The plaintiff also produced his grandson, Terry Lee Larimore, age 13, who testified that " * * * I've seen her, well, drinking, drunk maybe you know * * *"; that he saw defendant stagger; and when asked if he noticed whether or not defendant's speech was slurred, he was " * * * pretty sure it was"; that this did not happen all the time but " * * * just about a part of the time * * *"; and that on one of the evenings when he was at his grandfather's helping put up the hay, the defendant came in not too long after 10:30 P. M. and she was staggering and " * * * I think she was drunk."

Upon cross-examination this boy was asked if the plaintiff had talked the matter over with him and replied that the plaintiff had come by and " * * * he asked me to come along * * *" to court with him. When asked if the plaintiff had told him why he wanted him to come to court with him, the witness testified, "He said, I'd been out there this summer and I'd seen her drunk before and maybe I could testify something * * *"; and repeated at two other points in the transcript that this was what his grandfather, the plaintiff, had told him. He further testified that on the occasions he spoke of, the plaintiff was also present and said nothing to the defendant when he saw her drinking the beer, and that the defendant never

became loud or boisterous or ill mannered. During his testimony he was asked the following questions, and gave the answers shown:

"Q  Did you ever see your grandfather drink beer with her?

"A  Oh, let's see. I think I have. Maybe, I don't know. I don't think I have. I haven't.

"Q  Are you real sure, son, what you do or do not know here today?

"A  Well, I was never with them when they was drinking any place."

The defendant testified that these parties were married May 7th; that she was a good housekeeper, and his own children, who visited their home while it was being remodeled, told plaintiff that he "* * * really got it nice now"; that she did not sleep all day but got up in the mornings and fixed all his meals, including breakfast; and that she worked on the remodeling of the house and also helped plaintiff plant corn.

With regard to her drinking, defendant testified that she never got drunk but if she drank even one can of beer the plaintiff would accuse her of being drunk; that she did not drink everyday; that on the occasions a "handy 6" was at home she would drink three or four beers during the day but there had been occasions when she would drink more. With reference to going to taverns, the defendant denied that she did so except when in the company of her mother, and testified that when she took her mother to Festus, they would stop at "* * * local bar and have a drink and then come home"; that she worked at Alta's Tavern and Grocery Store before she was married, and drank beer before they were married; that she was not intoxicated on the occasion when the plaintiff's grandson stayed with them to help get the hay in; that the "Local Bar" was the only one she would go to with her mother because that was the one her mother "* * * goes to." It further appeared from her testimony that she stated she always showed respect and affection for her husband and his family also.

With regard to the automobile accident, she admitted that she did not tell her husband about having the accident because "Well, he was so cranky about that car, and since he had had his accident, I thought, my goodness, I'll sure get hung for this."

The defendant further testified that the relationship between her son and plaintiff was "pretty good" until after the big patch of corn was planted, and that the son plowed, and in fact worked so late one night that he got the tractor stuck in a gully on the way home because he could not see; that the boy also helped plaintiff with the planting; that defendant did not expect the plaintiff to work her son "* * * and ridicule him because he didn't know anything about the work * * *"; that it took several days to plow the field; that they planted a garden and the boy helped her take care of the garden and helped the plaintiff plant it. Defendant's further testimony was that about two weeks before the plaintiff filed for a divorce "* * * right out of the blue sky, he just came up to me and he said to me one day, 'Old girl,' he said, 'I want my divorce.'" that she said, "'Well, Frank, what you mean you want a divorce?' He said, 'That's just what I said. I want a divorce.' I said, 'Well, what have I done?' And he said, 'Well, you'll find out.' And I said, 'Well, now, listen Frank, we're not kids, we're adults.' And I said, 'Can't we talk this over?' I said, 'If there's something wrong, well,' I said, 'Maybe we can straighten it out.' 'No, no,' he said, 'I want my divorce'"; that about three or four days or a week before the separation, she had been to town for groceries and when she came in the plaintiff said he wanted his divorce, "And he said, 'Somebody's going to have to leave.' And I said, 'Well, it's not going to be me, Frank.' And he said, 'Well, my lawyer said somebody's got to leave,' and he said, 'I think it should be you, because this is my home.' Q. Now, did he then proceed to leave? A. Yes, he left then. I told him I wasn't going to leave.

So he said well, he have to go in and see"; that after leaving, the plaintiff came back from time to time, almost every day during the month she stayed on at the farm; that the plaintiff never did tell her why he wanted a divorce; that she had stayed on the farm for as long as two weeks without coming to town, that she did not want a divorce and stayed at the place a month thinking that after plaintiff " * * * had time to think it over maybe he'd come back", but that she would not go back to him now.

Other testimony offered on behalf of the defendant was given by Melvin Frazer, Mrs. Alberta Frazer, and Alta Simpson. Mr. Frazer testified that the defendant's reputation for truthfulness, veracity, morality and "generally being a good woman" was good, and that he and his wife had been with the defendant on many occasions but had never seen her become intoxicated. Mrs. Alberta Frazer testified that she had known the defendant for three or four years, and agreed with her husband's testimony as to defendant's reputation, and further testified that she had never seen the defendant " * * * conduct herself in any manner other than ladylike." Cross-examination of these two witnesses developed the fact that the defendant worked at Alta's and that Alta's was a tavern, and that most of the times they had been with the defendant were in the tavern, where the defendant worked behind the bar. Alta Simpson testified that she was the owner and operator of the grocery store and tavern referred to in the testimony as Alta's; that she had known the defendant about seven years, and also knew the plaintiff. She corroborated the testimony of the other two witnesses as to the defendant's general reputation, and further testified that she had never seen the defendant in "an intoxicated condition" or conduct herself "in any manner other than a ladylike manner." Cross-examination of this witness developed the fact that Mrs. Waters and her deceased husband lived next door to her place of business prior to his death.

The plaintiff first contends that the trial court erroneously refused to grant him a divorce on his petition. It is immediately apparent that some of the allegations of plaintiff's petition are not supported by evidence from the record. There is no substantial evidence to substantiate the allegation that the defendant married the plaintiff to get a home for herself and her son, and not because of any affection for him. No one testified to any such fact or to any facts from which such an inference could reasonably be drawn. To the contrary, this record clearly shows that it was he who wanted the divorce, and that the defendant did not want a divorce. Neither is there testimony to substantiate the plaintiff's allegation that defendant "habitually" drives plaintiff's car when she is intoxicated, nor that defendant habitually frequents taverns at night while the plaintiff is working. No one, not even the plaintiff, testified as to ever seeing the defendant drive the car while in an intoxicated condition, and the plaintiff himself admitted that he drew the conclusion that defendant was at taverns only from the fact that there would be additional mileage on the car that he could not account for. In addition, the plaintiff's own testimony negates his allegations that the defendant "habitually" drives the plaintiff's car without his permission and the allegation that on the occasion when defendant had her wreck with this car, she took it without his permission. His own evidence was that she would drive with him into Festus, and after letting him out for work, would take the car, and that he knew where she was going on the occasion when her wreck occurred. The reasonable inference is that he gave her permission to drive the automobile on these occasions.

Some of the other allegations of the plaintiff's petition are the subject of conflicting testimony. For example, the plaintiff testified that defendant slept late and failed to take proper care of the home and fix his meals and clean the house. The defendant testified directly to the contrary.

The plaintiff testified that the defendant frequently became intoxicated, and the defendant testified that she never became intoxicated. So far as the plaintiff's allegation that the defendant is habitually addicted to intoxicating liquor is concerned, the testimony of the parties and of the witnesses again conflicts sharply. With regard to this issue, the inescapable conclusion is that the plaintiff's grandson did not know of his own knowledge the things to which he testified, but was rather led to testify as to them by the plaintiff's discussion with him, or out of his desire to please his grandfather. His testimony is confused and conflicting, and in sharp contrast to that offered by defendant's witnesses on this issue. The plaintiff was not misled into believing that defendant did not drink. His own evidence on this issue shows that the defendant worked in a tavern when the plaintiff met her and began going with her. Neither is this a case where the plaintiff was opposed to drink. By his own admission, he drank beer when they first met, and the evidence also shows she continued to drink beer after their marriage and that the plaintiff himself drank. In these respects the case is similar to Elgin v. Elgin, Mo. App., 301 S.W.2d 869 at page 872. As plaintiff repeatedly testified, he was not trying to stop her drinking, but did not want her to go out to taverns and drink unless he was with her. But his evidence fails to disclose that she did go to taverns and drink. Plaintiff admitted that he never saw defendant drinking in any of these taverns he accused her of "habitually" frequenting. The only testimony in this record as to the defendant's presence in any tavern was given by the defendant herself, and that given by the witness Shannon with regard to defendant's visits to the tavern and grocery store near their home. Defendant's testimony as to stopping in for "a drink" in the company of her mother certainly does not substantiate plaintiff's allegation. The witness Shannon, who saw defendant get a "handy 6" from the grocery store near their home and take it home, never testified

he saw her drink there and further testified he never saw her engage in unbecoming conduct, and that he only knew of her getting a "handy 6" on three or four occasions. The provisions of § 510.310, subsection 4, RSMo 1959, V.A.M.S. adjure us to give due regard to the opportunity of the trial court to judge the credibility of the witnesses. The proof of the allegations of plaintiff's petition above reviewed depends entirely upon whose testimony the trial court believed. It believed the defendant's, and under this record it was certainly not clearly erroneous to do so, and therefore we cannot, on these allegations and the proof of them to be found in this record, set aside its judgment, § 510.310, supra.

■ The plaintiff's evidence was that the parties had some arguments and that the defendant complained about his waking her up and about various things about the house not working properly. The record also substantiates his allegation that the defendant deliberately misinformed him regarding the circumstances of her wreck. In Coleman v. Coleman, Mo.App., 318 S.W. 2d 378 at [1, 2] page 381, this court held, "The indignities sufficient to sustain a decree of divorce are wrongful acts and conduct over a course of time which are of sufficient gravity to make the plaintiff's life as defendant's spouse intolerable. (Citing cases.)" This record fails to disclose testimony as to these matters that shows a course of conduct or acts which over a course of time reached such grave proportions as to make plaintiff's life as defendant's spouse intolerable, but instead illustrates the trivial nature of the grounds upon which the plaintiff, and the defendant as well, hereafter, seek to abrogate this marriage. It does not appear from this record that these quarrels and bickerings were continuous or extended, or that they often occurred. The instance concerning the wreck, while we do not in any manner condone such activity by either spouse, was an isolated happening. Moreover, from this record it does not clearly appear that it was the defendant's wreck and not the combina-

tion of wrecks, one by the plaintiff and another by the defendant, with the defendant's occurring merely a week or so after the plaintiff's more serious wreck, that led to the cancellation of plaintiff's insurance. We find no error in the trial court's action in denying the plaintiff a decree of divorce.

The plaintiff also contends that the trial court prejudicially erred in awarding the defendant a divorce on her cross-bill based upon general indignities. Earlier herein the allegations of that cross-bill were stated, and the evidence summarized. Upon considering the evidence as to each allegation of defendant's cross-bill, we have determined the plaintiff's contention of error in this regard to have merit.

In an action for divorce based upon indignities, the party alleging the indignities has the burden to establish the truth of the charges by a preponderance of the credible testimony, Greenbury v. Greenbury, Mo.App., 223 S.W.2d 153. While this court defers to the trial court upon matters involving credibility, our ultimate duty is to try divorce cases de novo, reviewing the evidence and coming to our own conclusion and rendering such judgment as should have been given, Missouri Digest Divorce, ⊕183, 184.

There was no testimony to support the allegation that plaintiff's attitude and disposition toward defendant was hostile. The matter was not even touched on. There was no specific instance given upon which to base defendant's allegation that the plaintiff embarrassed her in public on the few occasions they went out together after their marriage. The entire evidence of this transcript on that issue consists of one question and answer. Her counsel asked her, "Now, you further charge that he embarrassed you in public among your friends on a few occasions when he did go out with you socially, is that true? A. That's right." Taken literally, all this testimony indicates is that she was aware that there was such an allegation in her cross-bill. With regard to testimony of this nature, in Capps v. Capps, Mo.App., 65 S.W.2d 661 at page 662, it was held that such evidence had no probative force. See also Van Horn v. Van Horn, Mo.App., 231 S.W. 634. Into this same category falls the allegation of the cross-bill that "* * * plaintiff has constantly mistreated and abused defendant's minor son by continually criticizing the said child and nagging him * * *." The only evidence given by defendant going to that issue arose during questioning of the defendant regarding the support of herself and the boy by plaintiff, and was that the boy worked with the plaintiff and helped him, and that "* * * I still didn't expect him to work him and ridicule him because he didn't know anything about the work, which disgusted the boy." Not one specific instance of any nagging or criticism was stated. Not once did defendant or anyone relate what was said or done. The plaintiff's testimony on the matter is of no assistance to defendant. His testimony was that he would ask the boy to do "* * * different little things * * *" and when the boy refused, plaintiff would ask the defendant why, whereupon he related what defendant would say. There is not even one report of any conversation between the boy and plaintiff. This record is devoid of any testimony, other than that one statement by the defendant set forth above, of any "criticizing and nagging" by plaintiff of defendant's son. The same is true of her allegation regarding the bickerings and arguments. That testimony also consisted of one question and answer. The question immediately followed that asked of defendant with regard to her allegation that plaintiff embarrassed her, and reads, "Q. And that he continuously engaged in unmerited bickerings and arguments with you. Did he argue with you at times? A. Yeah. He was always trying to start an argument is what he was doing. And then if I would say anything back to him why then he'd go off poutin'."

The remaining allegations of general indignities of defendant's cross-bill are that

the plaintiff left her and has refused to live with her, that plaintiff repeatedly absented himself from home without excuse or justification; and that plaintiff often sulked, pouted, and refused to converse with defendant. As to the first of these, the evidence is clear from the testimony of both parties that the plaintiff left home and refused to live with defendant only after he had told her he wanted a divorce. It is obvious from the very evidence given by the defendant herself as to what happened immediately prior to the separation that his leaving the home was in contemplation of the proceedings which he later instituted, and after talking with his lawyer and being advised that he could not continue to live with defendant after the proceedings were filed. There was no other evidence on this issue. Her allegation that the plaintiff absented himself from home repeatedly, without explanation or excuse, finds its only support in her testimony that he often left home at 11:00 or 12:00 in the morning, when he had to go to work at 3:30 P.M. She did testify that the plaintiff often sulked, pouted, and refused to converse with her, and that plaintiff would go "for hours and days" without talking to her. However, her own testimony showed that if, as she put it, she broke the ice and started a conversation, he would converse with her. It does not appear how often this would occur. Thus the evidence in this case fails to establish these occurrences as events which may be said to be of sufficient gravity as to constitute wrongful acts and conduct over a period of time which made the defendant's life as plaintiff's spouse intolerable, Coleman v. Coleman, supra. To the contrary, the evidence not only fails to do so, it clearly illustrates the trivial nature of the occurrences.

Accordingly, we hold the trial court erroneously granted defendant a divorce. The judgment should be affirmed as to denial to plaintiff of a divorce on his petition, and reversed as to granting the defendant a divorce on her cross-bill. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. The judgment is therefore affirmed as to denial to plaintiff of a divorce on his petition, and reversed as to granting the defendant a divorce on her cross-bill.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not participating.